906 A.2d 463

STATE OF NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. R.L., DEFENDANT–APPELLANT,IN THE MATTER OF THE GUARDIANSHIP OF B.L., A MINOR.

STATE OF NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. E.L., DEFENDANT–APPELLANT,IN THE MATTER OF THE GUARDIANSHIP OF B.L., A MINOR.

Superior Court of New Jersey
Appellate Division

Submitted March 21, 2006—Decided September 12, 2006.

Before Judges COBURN, COLLESTER and LISA.

*Yvonne Smith Segars,* Public Defender, attorney for appellant R.L. (*Michael Confusione,* Designated Counsel, of counsel and on the brief).

*Yvonne Smith Segars,* Public Defender, attorney for appellant E.L. (*Bernado W. Henry,* Designated Counsel, of counsel and on the brief).

*Zulima V. Farber,* Attorney General, attorney for respondent (*Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Jill G. Viggiano,* Deputy Attorney General, on the brief).

*Yvonne Smith Segars,* Public Defender, attorney for the minor (*Olivia Belfatto Crisp,* Assistant Deputy Public Defender, guardian ad litem, on the brief).

The opinion of the court was delivered by

COLLESTER, J.A.D.

In these consolidated appeals, R.L. and E.L., the natural mother and father, each appeal from a judgment entered by the trial court on April 27, 2005, terminating their parental rights to B.L., their son, and awarding guardianship of the child to the Division of Youth and Family Services (DYFS or Division). R.L. and E.L. each argue that the trial judge's respective findings and conclusions were not supported by clear and convincing evidence that all of the four statutory criteria for termination of parental rights had been satisfied. *N.J.S.A.* 30:4C–15.19(a). *See Division of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 604–11, 512 *A.*2d 438 (1986).

In reviewing a case in which termination of parental rights has been granted, we are mindful of the gravity and importance of our decision. Fundamental rights and interests of parents must be heavily weighed against critical concerns of the State acting as *parens patriae* to protect the health and welfare of children and to keep them from abuse or neglect or other conduct with deleterious consequences. A parent's right to enjoy a relationship with his or her child is of constitutional dimension. *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 346, 736 *A.*2d 1246 (1999) (citing *Stanley v. Illinois,* 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1213, 31 *L.Ed.*2d 551, 559 (1972)); *In re Adoption of Children by G.P.B., Jr.,* 161 *N.J.* 396, 404, 736 *A.*2d 1277 (1999); *In re Adoption of Children by L.A.S.,* 134 *N.J.* 127, 631 *A.*2d 928 (1993); *A.W., supra,* 103 *N.J.* at 599, 512 *A.*2d 438. We recognize that parents have a fundamental liberty interest in raising their biological children. *Santosky v. Kramer,* 455 *U.S.* 745, 753, 102 *S.Ct.* 1388,

1394, 71 *L.Ed.*2d 599, 606 (1982). The Federal and State Constitutions protect the integrity of the family unit. *Stanley, supra,* 405 *U.S.* at 651, 92 *S.Ct.* at 1212–13, 31 *L.Ed.*2d at 558–59; *A.W., supra,* 103 *N.J.* at 599, 512 *A.*2d 438.

■ There is a presumption that parents will act to promote the best interests of their children. *See Parham v. J.R.,* 442 *U.S.* 584, 602, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 118 (1979). However, "experience and reality may rebut what the law accepts as a starting point...." *Id.* at 602, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 119. Unfortunately, the incidence of child abuse and neglect demonstrates that some parents may act in ways that undermine the interests of their children rather than advance them. *Ibid.*

■ Accordingly, the State "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id.* at 603, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 119 (citing *Wisconsin v. Yoder,* 406 *U.S.* 205, 230, 92 *S.Ct.* 1526, 1540, 32 *L.Ed.*2d 15, 33 (1972)). The State as *parens patriae* may act to protect children from serious physical and emotional harm, which may require partial or complete severance of the parent-child relationship. Yet, "[f]ew forms of state action are both so severe and so irreversible." *Santosky, supra,* 455 *U.S.* at 759, 102 *S.Ct.* at 1398, 71 *L.Ed.*2d at 610.

■ When a biological parent resists termination of his or her parental rights, the court's function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm. *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992). That is, the focus of the inquiry is not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs. *Ibid.* "The analysis of harm entails strict standards to protect the statutory and constitutional rights" of the biological parents. *Ibid.* The burden rests on the Division as the party seeking to terminate parental rights "to

demonstrate by clear and convincing evidence" that the risk of "serious and lasting [future] harm to the child" is sufficiently great as to require severance of parental ties. *Ibid.*

The balance between fundamental parental rights and the State's *parens patriae* responsibility is promoted by the law's best-interest-of-the-child standard. *K.H.O., supra,* 161 *N.J.* at 347, 736 *A.2d* 1246. As first held in *A.W., supra,* 103 *N.J.* at 604–10, 512 *A.2d* 438, and later codified by the Legislature, parental rights may be severed only when

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1(a).]

These tests are interrelated and overlapping; they are designed to identify and assess what may be necessary to promote and protect the best interests of the child. *K.H.O., supra,* 161 *N.J.* at 348, 736 *A.2d* 1246. The considerations involved in determining parental unfitness are "extremely fact sensitive" and require particularized evidence that addresses the specific circumstances of the individual case. *Ibid.* (quoting *L.A.S., supra,* 134 *N.J.* at 139, 631 *A.2d* 928).

Therefore, in reviewing the factual findings and conclusions of a trial judge, we are obliged to accord deference to the trial court's credibility determination and the judge's "feel of the case" based upon his or her opportunity to see and hear the witnesses. *Cesare v. Cesare,* 154 *N.J.* 394, 411–13, 713 *A.2d* 390 (1998). We are not to disturb the judge's findings of fact unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend

the interests of justice." *Id.* at 412, 713 *A.*2d 390 (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974)). And, the conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review. *See Cesare, supra,* 154 *N.J.* at 412, 713 *A.*2d 390; *Rova Farms, supra,* 65 *N.J.* at 484, 323 *A.*2d 495.

Our obligation to defer to the trial court does not extend to issues of law, however. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty v. Township Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

With all the foregoing standards in mind, we turn to the facts of the matter before us.

B.L. was born on March 9, 2000, and within a few months, suffered unexplained injuries which led to suspicions that he had been abused. On August 29, 2000, at age five and one-half months, B.L. was taken to the emergency room of Newark Beth Israel Medical Center for treatment of a head injury. R.L. advised hospital personnel that she noticed a bruise on her son's head when she picked him up from a babysitter. Later R.L. said she confronted the babysitter, who denied any responsibility.

The hospital did not notify the Division or the police of suspected abuse. B.L. was observed and discharged with a follow-up examination scheduled with his pediatrician the following day. Although R.L. subsequently told the Division that she had contacted a DYFS worker that day, there is no record of any such report. It was several weeks after the incident before R.L. filed a complaint against the babysitter with the South Orange Police Department. Subsequent investigation indicated that the babysitter in question had ceased caring for B.L. some weeks before the child's injury occurred. The complaint was dismissed.

On November 30, 2000, B.L., then eight and one-half months old was again seen at the emergency room of Newark Beth Israel,

this time because he was not using his left arm. R.L. told the emergency room physician that she was not aware of any history of trauma. She reported that the child had been with a babysitter, Cleo Burnett, the day before, and R.L. surmised that the child may have fallen or been dropped at that time. B.L.'s wrist was swollen, and he had limited movement of his left arm. X-rays disclosed a broken wrist. B.L.'s left forearm was splinted and he was discharged in his mother's care and was referred to an orthopedist. Again the hospital made no notification to DYFS or the police of suspicious injury to B.L.

That changed on December 15, 2000. R.L. and E.L. both went with B.L. to the Newark Beth Israel emergency room because they had noticed a discharge and foul smell coming from the cast on B.L.'s left forearm. Additional x-rays indicated a new fracture to the humerus bone in the upper left arm. Because of this discovery, the doctors wanted to perform a full skeletal survey of the child's body. Both parents refused to consent. According to hospital personnel, they stated that they had to pay an x-ray bill for the emergency room visit only two weeks earlier on November 30, and that they did not want to incur the costs again. Hospital personnel reported that R.L. became belligerent and screamed profanities at the nurses and doctors. E.L. was also uncooperative. At one point hospital security was notified. DYFS was called and a three-day "social hold" was placed on B.L. by the hospital for further medical examination of the child and to give DYFS time to investigate the home situation to be certain that B.L. was not at risk. That evening the parents were taken to the Newark Police Department where they were interviewed by an investigator from the Essex County Prosecutor's Office and one or more DYFS workers. As they have maintained throughout this case, they said they were unaware of how the injuries to their infant son occurred.

The following day, December 16, 2000, B.L. was seen by Dr. Zafer Termanini, an orthopedic consultant. He was unable to make a diagnosis at that time pending review of the x-rays, but

after he saw B.L. again, a week later, he reported to Dr. Norma Yap, B.L.'s pediatrician, that he saw no evidence of child abuse. Dr. Yap then discharged B.L. to his parents with follow-up ordered. However, on December 26, 2000, members of the hospital staff called DYFS to advise that they were not satisfied with Dr. Termanini's finding and sent a letter the next day stating that while Dr. Termanini saw no evidence of child abuse, the December 16, 2000, x-ray suggested otherwise because it depicted a new left arm fracture. The letter recommended B.L. be reexamined by a pediatric orthopedist and DYFS closely monitor the case.

When consulted by DYFS regarding the conflicting opinions from the hospital, Dr. Yap said she relied on Dr. Termanini's opinion that the fractures were of the same age when she discharged the child from the hospital. She told the DYFS case manager that she had not seen previous indications of child abuse but suggested DYFS remove the child until it could be determined how the child was injured. The following day, December 28, 2000, Dr. Yap examined the child and reported that she did not observe any bruising of the arm. She told the DYFS supervisor that the parents were very upset with the number of people involved and felt they were being harassed.

The next day, a caseworker met with R.L. and E.L. and told them that DYFS needed time to sort out what had happened. R.L. and E.L. signed an informed consent for placement of B.L. outside the home. DYFS acted quickly. A pediatric examination was performed by Dr. Patricia Morgan–Glenn, a consultant to DYFS, who also interviewed R.L. in an effort to obtain an explanation as to the source of the injuries. With respect to the fracture of the arm, Dr. Morgan–Glenn stated the following:

R.L. was asked on multiple occasions by this examiner how B.L. sustained the fracture, and she responded, "I don't know" and "I'm not sure." Reportedly she told others [DYFS and hospital personnel] that he was banging his arm on a coffee table. R.L. never reported this to this examiner.

After her interview with R.L., physical examination of B.L. and review of the x-rays, Dr. Morgan–Glenn gave the following diagnostic impression:

(A) Possible physical abuse.

(B) Healing buckle (torus) fracture of the left distal radius.

(C) Healing fracture of the left distal ulna.

(D) Periosteal bone elevation of the left distal humerus.

She then set forth the following reasons for her conclusions:

1. The mechanism of injury is not known or is questionable. R.L. told this examiner she was unsure how B.L. sustained the fracture. There is also a report that he was banging his arm on a coffee table and that may be how he was injured. This is unlikely because of the degree of force an 8½ month old infant would need to cause this type of fracture.

In addition, this type of fracture is not caused in the above stated manner. This injury is typically caused by a fall onto an outstretched hand. A buckle fracture occurs as if the bone was driven together end to end and buckles under the pressure. With the appropriate history this could be an accidental injury. However, that history has not been provided.

There is also concern because the caregiver on or about the date B.L. was injured is unclear. R.L. states she had the child in her care for that week, however, R.L. told the ER that the babysitter was caring for the child prior to his injury. These are red flags and [concern] for possible abuse.

2. The periosteal elevation of the left arm distal humerus is a concern for abuse. Periosteal elevation due to new bone formation generally occurs about 7–10 days after an injury. This can occur even earlier in infants. It is the second stage of healing of fractures. In addition, periosteal new bone formation is thought to occur when extremities are pulled, twisted or grabbed.

There are other conditions that may be associated with periosteal new bone formation such as infection and certain vitamin abnormalities. Without additional symptoms of these other conditions, trauma is the probable cause. With no clear cause given, non-accidental trauma is a concern.

On January 11, 2001, R.L. filed a complaint against E.L. in the Essex County Family Part seeking sole custody of B.L., alleging that because E.L. was from Ghana, she was fearful that he might take the child away from her. Her application was granted on January 30, 2001. No transcript of the hearing is contained in the appellate record.

After the expiration of the fifteen-day consent removal of B.L., DYFS filed a complaint and order to show cause for protective services alleging that B.L. had suffered unexplained injuries and both parents had refused to cooperate with treatment at the hospital. The order to show cause for protective services was

granted, and B.L. was placed with N.B., a maternal aunt, on condition that R.L. was to have no unsupervised visitation.

Within a month, on February 11, 2001, B.L. was taken to the Newark Beth Israel emergency room by N.B. after sustaining another wrist fracture. Both the police and DYFS were notified. Because this was B.L.'s third fracture without explanation and R.L. had previously exhibited a violent temper, the hospital decided to admit B.L. When questioned about the child's injury, N.B. admitted that R.L. had spent unsupervised visits with B.L. despite the court restriction, including clothing and bathing B.L. everyday. It was after one of R.L.'s unsupervised visits that N.B. noticed the swelling in B.L.'s arm. She called R.L. to ask whether she should take B.L. to the emergency room. R.L. made it clear to her that she did not want her to do it.

Six days later, on February 17, 2001, hospital personnel reported to DYFS that E.L. was attempting to remove B.L. from the hospital against medical advice and despite a hospital hold on the child. E.L. also refused to consent to a recommended medical test to rule out osteogenesis imperfecta, commonly known as brittle bone disease, which causes premature fractures of bones. Eventually, after discussing the matter with the doctors and the DYFS caseworkers, E.L. consented to the test. The result ruled out brittle bone disease as a possible cause of the fractures.

B.L. was released from the hospital to a foster home placement until March 22, 2001, when he was placed with his maternal grandmother, R.B., under terms of a court order that the parents were to have no unauthorized contact with their son. Their visitation was to be supervised by an approved agency. Despite the restriction, the DYFS case plan was still reunification of B.L. with his parents.

Both R.L. and E.L. were referred for parenting skills training classes and psychological assessments were made of each of them. Dr. Linda Cameron completed her evaluation of E.L. on August 1, 2001. E.L. told her that the injuries occurred while he was working and that he did not know how they occurred. Overall he

was supportive of his wife's contention that she had not inflicted injuries on B.L. Dr. Cameron found that,

> E.L. seems to be genuinely concerned about the welfare of his son, but he did not seem to be equally focused on exploring the exact nature of his son's medical condition or the circumstances which may have explained the injury.

In her concluding paragraph, Dr. Cameron stated:

> Based on the clinical finding, E.L. needs to increase his awareness and sensitivity to the medical conditions of his son and to actively set up adequate safeguards in his home to prevent harm—further harm or injury to his son. Supervised home assistance may be required to facilitate the child's transition to his parents.

Dr. Cameron also conducted a psychological evaluation of R.L. on August 1, 2001. R.L. insisted that the medical findings of injuries to her son were "developed by the medical staff of the hospital." She related that B.L. had a "light fracture" on the wrist and that when she took the child to the hospital for removal of the splint, she was suddenly confronted with questions about another injury. She denied any physical abuse of her son. She gave as a possible explanation the fact that B.L. "is a pure African child, and we feed him African food, which made him quite active." She claimed independent medical findings refuted the physicians at Beth Israel and indicated that if there were injuries, they would have occurred when B.L. was with babysitters. Dr. Cameron reported that the results of the MCMI–3 profile of R.L. characterized her as exhibiting borderline behaviors and highly-variable moods, including impulsive anger. She recommended R.L. receive therapeutic intervention.

In early August 2001, a DYFS caseworker went to the defendants' home to advise them of an intake appointment for visitation with B.L. and found that B.L. was living in the home. E.L. explained that the maternal grandmother had returned B.L. to their care a few days earlier because she had to relocate and because B.L. "was getting to be too much for her." Neither the maternal grandmother nor the defendants notified DYFS of the change in custody. As a result, an emergent application was made to the Family Part judge, and the child was removed and placed in foster care on August 8, 2001. He remained there for several

months while DYFS provided services including parenting skills classes and supervised visitation with a goal of reunification of the family.

A psychiatric evaluation of R.L. conducted by Dr. Ronald W. Cranton made reference to a report from a therapist of the Family Service Bureau of Newark indicating uncertainty as to the safety of B.L. if he returned to live with R.L. Dr. Cranton echoed this opinion. A later evaluation of R.L. by Dr. Denise Williams Johnson on April 9, 2002, also stated there was insufficient data to render an opinion about the safety of B.L. with his mother, stating that if DYFS moved forward with the placement of the child back into the home, great caution was warranted.

> It is extremely disturbing that it has not been determined who injured the child, nor how the child was injured. This leaves open to question numerous possibilities including: another in fact injured the boy and to date has not been truthful about it; the boy was injured repeatedly across several caretakers, including after DYFS placement with an aunt, where the mother and father reportedly had liberal visitation. Mother continues to accept literally no responsibility for the child's injuries, not even her choice of caregivers, nor leaving the child with certain caregivers even after the child was reportedly injured by/with them. The mother gave a lot of seemingly contradictory information at the initial point of the DYFS medical investigation. It was curious that the mother's response to a question about DYFS' concerns was ... "they have no evidence I did it to the boy," rather than a frank denial of injuring the child. Mother's concerns about the DYFS ordeal appear to focus on herself. She did not express any empathy for what the child went through being injured, or multiply placed. These data do not bode well. Typically, individuals are more likely to change a pattern of behavior after they accept that they did something that was in error.

At a review hearing on May 30, 2002, the Family Part judge found that B.L. was at risk in the care of his biological parents. The judge directed that overnight visitation cease and asked the Division to reconsider its plan from reunification to adoption. The basis for the judge's suggestion was an updated report of Dr. Johnson expressing concerns because of reports that the foster mother said that when she returned after visitation, the child had scratches and bruises and was dirty, tired and not properly dressed. Dr. Williams Johnson found the foster mother's comments disturbing because:

> If these problems are being displayed despite the current level of Court and DYFS involvement/monitoring, then this raises concerns about the child's potential status when he has increased contact with the parents, and a subsequent decrease in DYFS/Court monitoring. There is currently not enough data to render an opinion about whether the child's upset about traveling between the two households is greater than it would be for any child in his situation. If anything, this probably bespeaks of the need to address permanency as soon as feasible.

For the next several months B.L. remained in foster care while DYFS worked to reunify him with E.L., then separated from R.L. E.L. was permitted to have unsupervised visitation which was later expanded to overnight visits and then weekend visits. No problems were reported, and on December 20, 2002, B.L. was returned to the custody of his father on the condition of no unsupervised visits by R.L. E.L. took a one-month leave of absence from his job as an interstate bus driver to be with his son fulltime until he found an approved babysitter for time he was at work. E.L. found a woman he had known for three years who, like E.L., was from Ghana. The DYFS worker agreed that this babysitter provided quality care. However, since she was not a permanent resident of the United States and did not have a social security number, the regulations required she be fingerprinted so a full background check could be conducted. She declined, and accordingly, DYFS could not approve her as a babysitter for B.L. Because E.L. continued to use the same babysitter, the matter was referred back to the Family Part judge who directed that E.L. select and pay for a babysitter from a DYFS list provided to him even though it significantly increased his child care expenses.

At this point in time DYFS was prepared to terminate the litigation, leaving B.L. in the custody of his father with a recommendation that R.L. was not to have unsupervised visits. However, six months later, in early July 2003, things changed dramatically.

DYFS caseworker Anthony Quiles was assigned to the matter in July 2003. He was aware that B.L. was residing with his father and that reunification remained the goal. In the first week of July he visited E.L.'s home and was told by E.L. that B.L. was at his day care center with R.L. and that she had custody of him under a

court order.  Quiles and E.L. went to the day care center to retrieve B.L., and he was returned to his father.  However, almost immediately, B.L. was back living with his mother.  After an emergency hearing on July 9, 2003, the Family Part judge ordered DYFS to remove B.L. and place him back in foster care.

Later, at the guardianship trial, E.L. testified as to the events of early July 2003.  He said he returned from a business trip and went to the babysitter's home to collect his son.  The babysitter told him that R.L. had come and taken the child with her.  E.L. went to R.L.'s home and saw that B.L. was there.  R.L. claimed she had custody of the child by a court order, that DYFS knew and that she would have E.L. arrested if he attempted to take the child back.  E.L. said that later after he and Quiles took the child from the day care center, R.L. went to his home and told him that unless she had possession of the child, she would call the police, tell them E.L. committed domestic violence and have him arrested.[1]  E.L. said he gave R.L. the child because he knew they were to appear in court in two to three days.  He said he did not fear for B.L.'s safety in the interim.[2]

E.L. again underwent a psychological evaluation by Dr. Johnson on August 19, 2003.  He said he had given the child back to R.L. after she threatened to have him arrested, and he knew from past experience that she would lie to the police.  He told the psychologist that R.L. had signed a previous domestic violence complaint against him prior to the incident, which had also been dismissed. He told Dr. Johnson that he had been fooled by his wife in the past and was fearful of her but that he later realized her claims of custody were not legitimate.  He said that he was permanently separated from R.L. and that she was initiating divorce proceed-

---

[1] In fact, R.L. did sign a complaint alleging domestic violence on July 5, 2003, which was dismissed after a finding that domestic violence had not been substantiated.

[2] A full scale x-ray upon B.L.'s return to foster care indicated no current fractures or sprains.

ings. He asserted that if he regained custody, he would allow R.L. to see the child only for approved visits.

In her report Dr. Johnson said that in the absence of information about the two domestic violence complaints, she was concerned about "the level of violence in the home." She was also concerned by the fact that E.L. did not fear for B.L. when he was in R.L.'s care and considered her a "good mother." Based on the fact that E.L. gave B.L. back to R.L. after DYFS told him the child should remain in his care only, Dr. Johnson opined that "his concern appeared to be more for himself [not being arrested] than it was for the child. This does not bode well for the client's ability to monitor and supervise the child with the mother." However, the doctor found strengths in E.L.'s capacity as custodian of B.L. Namely, he loved and was committed to his son and had a good work ethic, a moral base and a capacity for good relationships. The doctor stated in conclusion that she did not have sufficient data to render an opinion about E.L.'s level of "direct threat to the child's physical safety." She recommended increased DYFS monitoring and individual psychotherapy for E.L. if the child was returned to him.

After his removal from his father's home and return to the foster home, B.L.'s behavior deteriorated. Then three-years old, he smeared feces over himself and the wall. He began to destroy toys and utter curse words. He required therapy.

DYFS reports indicated that B.L. continued to talk about his father often, and he looked forward to visitation with him. E.L. visited consistently except when he was out of state for on business and he rescheduled appointments for visitation when they could not be kept. The foster mother said that B.L. loved his father and was in a happy mood when he returned from visits. However, B.L.'s behavior at school deteriorated, as did his behavior at the foster home. The foster mother said she was not willing to adopt.

At the guardianship trial Dr. Sean Hiscox testified on behalf of the Division as to his psychological evaluations of R.L. and E.L.

and the bonding of each parent with B.L. He concluded that R.L. was not capable of providing minimally adequate care for B.L. primarily because of her previously diagnosed psychotic and mood disorder. He said her precarious psychological status coupled with B.L.'s history of serious, inexplicable injuries while in her care placed the child at risk of significant maltreatment. During his evaluation of R.L. he noted paranoid and delusional thinking including her allegation that DYFS attempted to kill her by running her off the road in 2001. She also claimed that B.L.'s injuries never occurred, and that the doctors at the hospital conspired with DYFS for money to fabricate the injuries. Dr. Hiscox noted R.L. was inconsistent in visiting her son and had said she was obtaining a divorce and was not in a position to care for her son at that time. R.L. was uncertain as to how much time she would require before she could do so. Once again she had no explanation for B.L.'s injuries and took no responsibility for them even though B.L. was injured in her care. She also expressed no sympathy to B.L. Therefore, Dr. Hiscox concluded that B.L. would be at risk of physical harm in R.L.'s care.

Dr. Hiscox acknowledged that E.L. did not suffer from any serious psychopathology. He minimized his son's injuries and believed that some were exaggerated by the doctors at the behest of DYFS. He refused to acknowledge that his wife was responsible for E.L.'s injuries. At that time he had not sufficiently planned for the possibility that B.L. might be returned to him.

Dr. Hiscox's bonding evaluation was based upon observation of B.L. with the parents for about ninety minutes. He found that B.L. was not bonded to either parent and that his need for permanency outweighed his need to be with either natural parent. The doctor stated that B.L. would not suffer severe, enduring harm if E.L.'s parental rights were terminated and that another failed reunification with E.L. would be devastating to the child.

Dr. Matthew B. Johnson, Ph.D., evaluated B.L. at the request of the defense and focused on the parenting capacity and placement needs of E.L. He noted that E.L. denied knowledge that he or

his wife had injured B.L., thought that the allegations stemmed from a medical error and complained because he had been unable to pursue a second opinion. He found that E.L. suffered from no psychological impairment or identified risk of parenting dysfunction and was of the opinion that B.L. and E.L. shared a warm parent-child relationship that was meaningful to the child. He said his observation of the child with E.L. confirmed this relationship. He said the child recognized E.L. as his father, and he enjoyed care and contact from his father. The doctor admitted that should the child be returned to E.L., it would be necessary for a number of social services to be put in place to deal with problems created by the numerous placements since B.L. had been out of E.L.'s custody. He also testified that terminating E.L.'s parental rights would have an adverse effect on the child. Dr. Johnson also believed E.L. was uniquely capable of attending to all the child's special needs.

The trial judge noted that Dr. Johnson did not conduct a bonding assessment. The judge also discounted his testimony for the following reasons:

> In the testimony before the court, Dr. Matthew Johnson gave an opinion that B.L. has an enduring and positive relationship with his father. The court finds that opinion not to be credible because it's simply not supported by the record in this matter or by anything that Dr. Johnson observed or reviewed.
>
> Dr. Matthew Johnson also gave an opinion that B.L. has a profound positive attachment to his father. The court also finds that opinion not credible and not supported by the observations of Dr. Johnson with B.L. or any of the materials by him.

The court did accept the testimony of Dr. Hiscox as well as his recommendations. Accordingly, the court found that the Division had satisfied its burden of clear and convincing evidence of the statutory factors set forth in *N.J.S.A.* 30:4C-15.1a.

■■■ After careful review of the record we conclude that there is more than sufficient credible evidence to support the trial judge's conclusion that the parental rights of R.L. should be terminated. The record clearly shows that the infant suffered numerous serious injuries over a short period of time while under

R.L.'s direct care, and she never gave a reasonable explanation as to how any of the injuries occurred. Her attempt to blame some of the injuries on babysitters was clearly contradicted by facts in the record indicating the child was not in the care of a babysitter at the time of the injuries. It is also telling that since his removal from R.L.'s care, the child suffered only one other fracture, and that was during a time when R.L. had unsupervised visits. Furthermore, R.L. has shown an almost total lack of cooperation with DYFS throughout the proceedings, even alleging a homicidal plot against her. All the evaluations performed indicate that she is indeed a significant risk to the safety, health and development of her child. The overwhelming proof is that she is unable or unwilling to eliminate harm facing the child or to provide a safe and stable home. Finally, the child has been outside her care for almost his entire life, and no significant bonding has been observed. Clearly, the trial judge properly found that terminating R.L.'s parental rights would not do more harm than good for her son.

The case with respect to E.L. is more troublesome. Although the court made findings to the contrary, the record inclusive of reports from DYFS caseworkers and psychologists other than Dr. Hiscox indicate that throughout the child's life B.L. has had a good relationship with his father even while he was in the custody of foster parents. Dr. Hiscox's bonding evaluation is hardly determinative in light of the fact that it consisted of observation in a controlled environment for slightly over one hour. Dr. Hiscox gave considerable weight to his observation that E.L. used his cell phone during the visit with his son, which he believed justified a conclusion that E.L. was more focused on himself than his child. However, E.L. testified without contradiction that he was calling relatives who had not seen B.L. since his removal from E.L.'s care so that they could talk to B.L. Moreover, Dr. Hiscox performed no bonding evaluation with the foster parents. In fact, the record shows that B.L. had a series of foster parents and that

the foster parents with whom B.L. was living at the time of the trial had custody of him for only five months.

It is clear that E.L. did not believe his wife deliberately injured their son and has maintained this belief. However, the fact that he believed his wife does not in itself indicate an inability or unwillingness to protect B.L. As we recently stated,

> [O]ne parent cannot be held responsible for the shortcomings of the other at the cost of forfeiting his parental rights; the non-culpable parent is obliged only to exert reasonably successful efforts to protect the child from the harm inflicted by the deficient parent.
>
> [*Division of Youth and Family Servs. v. M.M.*, 382 *N.J.Super.* 264, 282, 888 *A.*2d 512 (App.Div.) *certif. denied and certif. granted*, 186 *N.J.* 606, 897 *A.*2d 1060 (2006).]

His hostility toward DYFS and hospital personnel is also of concern, but it does not relate to his ability to parent his child, provided there can be some reasonable assurance that he would abide by restrictions placed upon him by the court as to contact with R.L. As to whether E.L. is capable of caring for B.L., our review of the lengthy record indicates that during the six-month period that he was sole custodian of his son, the child received proper care. There is no doubt that but for the incidents in early July, during which B.L. spent a weekend with R.L., this action would have been concluded three years ago with the child living with his father on a permanent basis. Therefore, we conclude that the Division did not satisfy the necessary prongs of *N.J.S.A.* 30:4C–15.1(a)(1), (2) and (4), and reverse the order terminating E.L.'s parental rights.

There has been no contact between E.L. and B.L. since June 7, 2005, when visitation was terminated. There can be no question that things have changed. In a footnote to its brief, the Division states that B.L. has been living with the same foster family since that time and that he is bonded to them. Of course, that is subject to investigation including a bonding evaluation of the foster parents, which has never been done. E.L.'s present circumstances and ability to parent his son also needs to be reassessed as well as his amenability to accept assistance from DYFS

and adhere to all orders of the Family Part judge. An updated psychological evaluation of E.L. and also B.L. should be considered. Therefore, we reverse and remand the matter to the Family Part for proceedings in accordance with this opinion. We do not reserve jurisdiction.

Affirmed in part. Reversed in part.