# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2698-18T3

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

A.G.,

     Defendant,

and

J.G.,

     Defendant-Appellant,

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.G.,

     a Minor.

_____

Submitted February 10, 2020 – Decided  February 26, 2020

Before Judges Rothstadt and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0063-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Howard B. Tat, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; Toni Lynn Imperiale, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel Christian Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant J.G. appeals from an order entered by the trial court on February 1, 2019, which terminated his parental rights to his biological daughter, a minor.[1] After Jesse alleged that J.G. sexually assaulted her, he was arrested and charged with aggravated sexual assault, sexual assault, and endangering the welfare of a child. The Division of Child Protection and Permanency (the Division) executed an emergency removal, seeking to terminate the parental rights of both J.G. and A.G., Jesse's biological mother,

---

[1] We refer to the minor as "Jesse" to protect her anonymity. See R. 1:38-3.

for neglect.  After a trial, the court terminated the parental rights of J.G. but found that the Division had failed to satisfy its burden of proof to terminate A.G.'s parental rights.  Having reviewed the record, and in light of the applicable law, we affirm.

I.

We discern the following facts from the record.  Jesse, the biological child of J.G. and A.G., was born in 2005.  During their marriage, J.G. and A.G. had six children in addition to Jesse.  The family had been involved with the Division for numerous referrals since February 2012,[2] and in July 2012, the court entered an order to show cause (OTSC) for care and supervision of the children after neglect was substantiated against J.G. because he had "left . . . the children unattended while he slept."  The July 2012 litigation was terminated in January 2015, after the court found that J.G. and A.G. had remediated the issues which prompted its initiation.

Thereafter, in May 2015, "[t]he Division received a referral of sex abuse of [Jesse]."  Namely, A.G. alerted officials at Jesse's school that J.G. had been sexually abusing Jesse.  Jesse, then nine years old, confirmed to school staff that

---

[2] The family had been the subject of several referrals to child protective services in Florida before moving to New Jersey in 2011.

A-2698-18T3

J.G. had been "touching her privates" since she was five, so the staff contacted the Division. Division caseworker Jessica Nunez interviewed A.G., who claimed that Jesse told her that J.G. would make her "watch movies and . . . do disgusting things," and "he threatened to hurt her if she told anyone." A.G. also claimed that J.G. physically abused her.

Giselle Henriquez, an employee of the Child Advocacy Center, interviewed Jesse, who "mentioned several incidents of sexual abuse." Jesse recounted one instance where J.G. "put his hands on her 'butt' underneath her clothing. She reported telling him to stop at which point [J.G.] pushed her on the floor, spit on her 'butt' and began rubbing her 'butt.' She reported he later put 'sticky white stuff on her butt.'" Jesse advised Henriquez that "she never told anyone because [J.G.] 'threatened to hit her until she dies' and also threatened to hurt [A.G.]" Jesse also mentioned an incident where "she would have to 'rub' [J.G.'s penis] back and forth and also 'put her mouth on it'" and that "white stuff would go in her mouth," causing her to gag and spit it out.

Jesse also recounted another incident where "[J.G.] put his mouth on her '[vagina]' and asked her 'how does it feel,'" while "he was also 'touching his [penis].'" Jesse claimed that J.G. would make her "watch[] cartoon pornography" and that she would be "tied up with 'blue and white ropes'" on

4

several occasions. Jesse added that J.G. would regularly smoke a "plant" in the home and "would also force her to smoke with him." Jesse also explained that she had "witnessed [J.G.] punch [A.G.] in [the] face and throw her down the stairs." Jesse also "reported [J.G.] would watch videos on his cell phone and touch his [penis]," and she believed that he may have had a video of her on his phone.

After these allegations came to light, J.G. "was taken into custody at the Passaic County Prosecutor's Office." He refused to address any claims that he abused his daughter. He was "arrested and charged with aggravated [s]exual [a]ssault . . . , [s]exual [a]ssault . . . , and [e]ndangering the [w]elfare of a [c]hild."

The Division substantiated these allegations against J.G. after conducting a thorough investigation. The Division's investigation also revealed that the family's "home was in [a] deplorable condition[]." After A.G. failed to remediate these conditions, on May 21, 2015, the Division executed a notice of emergency removal, pursuant to N.J.S.A. 9:6-8.29 and N.J.S.A. 9:6-8.30, without court order. The Division filed an OTSC to remove the children from the home, and the court granted the Division custody, care, and supervision of the children on May 26, 2015. J.G.'s visitation with Jesse was temporarily

suspended due to his charges of sexual assault and child endangerment.[3]  The

Division asked J.G. for relatives who could act as placement resources for the

children, but he expressed "that he did not really have any," and he did not

advocate for any of the relatives that the Division identified.

On June 4, 2015, the Division referred Jesse to the Audrey Hepburn

Children's House at Hackensack University Medical Center for a psychosocial

evaluation to assess how J.G.'s abuse affected her emotional functioning.

During the evaluation, Jesse admitted to suicidal thoughts "when she thinks of

[A.G.'s] functioning following her disclosure of sexual abuse and her siblings'

removal, her removal, and the sexual abuse of [J.G.]"  She also reported being

upset for not disclosing J.G.'s abuse earlier but that she was deterred by his

threats to harm her or A.G.  The results of the evaluation clinically supported

that Jesse had been sexually abused, physically abused, and exposed to domestic

violence, substance abuse, and environmental neglect, as a result of J.G.'s

conduct.  The results also supported a diagnostic impression of post-traumatic

stress disorder (PTSD).

After Jesse's removal, the Division provided A.G. with "[a] psychological

evaluation, [domestic violence] counseling, and parenting" services, and Jesse

---

[3]  Visitation was suspended throughout the pendency of this litigation.

A-2698-18T3

and two of her siblings were reunified with A.G., pursuant to a court order dated September 15, 2015. The Division terminated litigation on May 16, 2016, but it was reopened on May 25, 2016 after the children were again removed pursuant to a notice of emergency removal due to "[u]nsafe housing" as there was no electricity in the family home. On May 27, 2016, the court granted the Division custody, care, and supervision of Jesse and her siblings and granted A.G. twice weekly visitation.

From June 16 through June 24, 2016, Jesse was admitted to Hoboken University Medical Center (HUMC) "for aggressive behavior towards [A.G.]" Jesse presented with depression, hopelessness, and symptoms of PTSD. In connection with her PTSD, HUMC staff noted that Jesse suffered from "intrusive thoughts about her abuse, hypervigilance, startling easily, and nightmares," and she exhibited "[p]oor impulse control" and "difficulty regulating her emotions at times."

On July 11, 2016, the Division was ordered to explore whether any maternal relatives would be appropriate for placement and to facilitate the relocation of A.G. and her children to Florida. Thereafter, the Division determined that the residence of Jesse's maternal grandparents was suitable for

A-2698-18T3

placement, and it contacted child protective services in Florida to continue services for A.G. and her children.

Jesse was again hospitalized from January 31 through February 7, 2017 at Bergen Regional Medical Center, "for running away from school twice and express[ing] suicidal ideation with a plan to hang herself." Following a March 8, 2017 compliance review order, the Division admitted Jesse to a care program at Legacy Treatment Services' Hawthorne House on June 12, 2017. Jesse attended various therapy sessions and received services but still struggled with regulating her emotions. On two separate occasions, Jesse "purposefully [went] missing" after becoming upset during therapy sessions, requiring staff and the police to locate her.

On November 15, 2017, the trial court entered an order providing that "[A.G.] shall provide contact information for [Jesse's] paternal uncle to the Division, as he is interested in visitation with [Jesse]," and "[a] Division worker shall visit [J.G.] at the Passaic County Jail within the next [ten] days to explore his concerns." After the Division followed up with A.G., she denied having contact information for Jesse's paternal uncle and stated that the uncle was ill-suited for placement based on prior events.

On April 6, 2018, the Division filed a complaint for guardianship, seeking to terminate both J.G.'s and A.G.'s parental rights to Jesse. On April 19, 2018, Judge Imre Karaszegi, Jr., held a hearing on the Division's OTSC, during which he directed the Division to explore whether Jesse's paternal aunt could act as a resource placement. On May 25, 2018, the judge held a hearing on the return OTSC, at which he ordered that Jesse remain in the custody of the Division and that the Division meet with J.G. monthly. On August 6, 2018, Jesse was discharged from Hawthorne House and "transitioned to treatment home level of care" at a Devereux therapeutic foster home.

On November 27, 2018, a jury found defendant guilty on twelve counts related to his sexual abuse of Jesse.[4] The guardianship trial commenced on January 8, 2019 and continued through January 18, 2019.

At trial, the Division called as its first witness Paree Freeman, a Division adoption worker assigned to Jesse's case. Freeman testified as to the Division's efforts to facilitate placement with paternal relatives and explained that none were suitable or able to care for Jesse. The paternal grandmother, with whom J.G. wanted Jesse to be placed, was already preoccupied with acting as a

---

[4] J.G. is ineligible for parole until May 2066.

A-2698-18T3

resource parent for Jesse's siblings. Freeman also explained that Jesse's current resource parent was interested in adopting her.

The Division next called Dr. Robert Miller as a witness, who testified "as an expert in the field of clinical psychology pursuant to N.J.R.E. 702." Dr. Miller testified that he had evaluated A.G., who disclosed numerous instances where J.G. physically and emotionally abused her. A.G. also advised Dr. Miller that Jesse had witnessed several instances of domestic violence, which included physical abuse "during critical moments of aggression."

Dr. Miller also testified that he psychologically evaluated Jesse on November 30, 2018. He explained that the purpose of the evaluation was "to describe her current psychological functioning and to receive her views of . . . the psycho-legal questions regarding the sexual abuse, exposure to domestic violence, her relationships with . . . her mother and her father and her siblings, and to make recommendations regarding . . . treatment[]." When Jesse spoke of the sexual abuse, Dr. Miller noted that "[she] appeared to dissociate. She appeared highly anxious. . . . Her leg was shaking. . . . Her behavior was markedly different when questioned regarding the history of sexual abuse[ and] her mother's lack of support. It was quite noticeable."

Dr. Miller also testified to Jesse's description of J.G.'s abuse. This included "being stripped naked in the shower and hit with a wire, being slapped[,] . . . being punched[,] and being threatened and called [a] whore and told she was nothing." Jesse told Dr. Miller that "her mother [was] present during many incidents of physical abuse and did nothing." She also "described her father threatening her on multiple occasions." Jesse also detailed witnessing J.G. abuse A.G., which made her "depressed and angry." Dr. Miller explained that while Jesse "understood that it was not her fault that her father was in jail[,] . . . when she heard the length of [his] sentence, she expressed some remorse" and showed "an inappropriate internalization of responsibility."

Dr. Miller also testified that he had conducted "a [PTSD] symptom inquiry of [Jesse]." Dr. Miller concluded that Jesse "experienc[es] chronic PTSD, meaning she experiences intrusive memories regarding the sexual abuse or exposure to domestic violence . . . three or four times a month. This is diagnostic criteria for chronic PTSD. She also described dissociative symptoms." Dr. Miller testified that Jesse

> experiences them at any reminder, sometimes not reminders of the trauma. She has them sometimes coming unbidden when she doesn't want to think about them. They can come any time. They come sometimes at night. They come sometimes with a reminder of the trauma, a trigger that reminds her of a specific event.

A-2698-18T3

> She described sometimes she tries to push these memories out of her mind, that it's very difficult.

Jesse explained to Dr. Miller that she would cope by listening to music and "going into the shower and trying to wash herself several times . . . a day . . . to clean off the disgusting feeling from her body [from] the sexual abuse." Dr. Miller also found that Jesse gets "cognitive distortions . . . meaning she misunderstands sometimes people's wanting to be friends with her." This often causes "feeling[s] of shame . . . [and] embarrassment, and because that feeling is very painful for her, she translates it into a rage attack . . . and she lashes out." Jesse also described having such feelings when hearing "[l]ies that her mother tells." Dr. Miller testified that Jesse's anger is a symptom of PTSD, stemming from her parents' neglect, her exposure to domestic violence, the sexual assault and abuse by J.G., and A.G.'s rejection of her disclosure.

Dr. Miller also testified that the results of Jesse's psychological testing revealed that she suffers from dysthymic syndrome, which is characterized by "broken attachments in childhood" and a distrust of others, which he attributed to "her history of emotional neglect[ and] physical and sexual abuse as a child." Dr. Miller testified that Jesse will always be impacted by her childhood trauma, although she would likely develop effective coping strategies within two to five years.

A-2698-18T3

Dr. Miller opined that Jesse would suffer no harm if her parents' parental rights were terminated:

> [Jesse] does not want to see her father, the perpetrator in this case of sexual assault[s] [for] many years. She is very aware of her mother's limitation and does not want to live with her mother, does not believe her mother can provide her with . . . a basis for which she can achieve her dreams and goals[,] and [she] wants to have a chance at that in adoption. She requested select home adoption, which is the plan. She wants to be in a family[.]

Dr. Miller testified that for these reasons, he recommended against reunification with either parent. On cross-examination, Dr. Miller conceded that no bonding evaluation was conducted between Jesse and either parent but that it was unnecessary because "there[ was] no identified select home adoption yet," and Jesse had no desire to see A.G.

After calling Jessica Checo, the Division adoption supervisor assigned to Jesse's case, as a witness, the Division next called Jesse. Jesse testified that she was currently receiving Division services to address her trauma-related symptoms and her anger that resulted from her "abuse at home and . . . the sexual abuse from [her] father." Jesse explained that in addition to being abused by both of her parents, both of whom would hit her, she was forced to care for her brothers and sisters. Jesse further testified that her therapy was going well, and

she was now "stable" and able to relate to others in her household. Jesse testified to her desire to be adopted by her resource parent, but if her resource parent was unable to adopt her, she would still want to be adopted.

On February 1, 2019, the trial judge entered an oral decision and executed a judgment of guardianship terminating J.G.'s parental rights to Jesse. The judge considered whether the Division had satisfied its burden to terminate the parental rights of J.G. and A.G. under N.J.S.A. 30:4C-15.1(a). The judge concluded that, with respect to J.G.,

> [t]he Division established that [Jesse] has been endangered by the parental relationship, as [J.G.] has been found guilty in a separate criminal case on three charges of aggravated sexual assault, three charges of sexual assault, five charges for endangering the welfare of a child, one charge of abuse, abandonment, cruelty, and neglect of a child, and one charge of terroristic threats as it relates to [Jesse].

With respect to N.J.S.A. 30:4C-15.1(a)(1), the judge determined tha

> the Division has shown by clear and convincing [evidence] that [Jesse's] safety, health, or development has been or will continue to be endangered by the parental relationship with [J.G.] [J.G.] has been convicted following a criminal trial for the sexual abuse of [Jesse] and is currently incarcerated and will be sentenced in February . . . 2019.

The judge also found that

[N.J.S.A. 30:4C-15.1(a)(2)] has been satisfied, as the Division has established by clear and convincing evidence that [J.G.] is unable to eliminate the harm facing [Jesse] and is unable to provide [her] with a . . . safe and stable home, as [he] remains incarcerated for the sexual abuse of [Jesse], [Jesse] corroborated such abuse through her testimony, and [J.G.] shall remain incarcerated for the foreseeable future.

The judge also determined that, regarding N.J.S.A. 30:4C-15.1(a)(3),

the Division has shown by clear and convincing evidence that reasonable efforts were provided to [J.G.] to help correct the circumstances that led to . . . [Jesse's] removal. The Division offered substance abuse assessments, housing assistance, ECAP services, and relative exploration. The Division has met its burden for the second part of this prong, as there are no alternatives to the termination of . . . [J.G.'s] parental rights. . . . [I]t is the opinion of the [c]ourt that the Division has met its burden for the third prong by clear and convincing evidence.

Finally, regarding N.J.S.A. 30:4C-15.1(a)(4), the judge explained that

the Division relied on [J.G.'s] criminal conviction for sexual assault and other criminal counts as they pertain to [Jesse] as well as the trauma experienced by [Jesse] as a result of the sexual abuse by [J.G.] [J.G.] was convicted and remains incarcerated for his sexual abuse of [Jesse]. This [c]ourt finds that in light of the evidence presented by the Division, that the Division has met its burden on prong four by clear and convincing evidence.

For these reasons, the judge concluded "that the Division has established all four

prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing [evidence] as to

[J.G.]" and ordered that his parental rights to Jesse be terminated. The judge determined, however, that the Division had not met its burden with respect to A.G., so he declined to terminate her parental rights. Thus, the judge entered a judgment of guardianship terminating J.G.'s parental rights. This appeal ensued.

On appeal, J.G. raises the following arguments:

> 1. THE TRIAL COURT ERRED BY APPLYING THE INCORRECT STANDARD IN FINDING [J.G.] CAUSED [JESSE] HARM AS THERE WAS NO EVIDENCE PRESENTED OF AN ASSAULT OUTSIDE OF [J.G.'S] CRIMINAL CONVICTION.
>
> 2. THE TRIAL COURT ERRED IN FINDING THAT THE DIVISION HAD PROVIDED [J.G.] WITH REASONABLE SERVICES AS NO SERVICES WERE PROVIDED WHICH ADDRESSED THE ALLEGED SEXUAL ASSAULT.
>
> 3. THE TRIAL COURT ERRED IN FINDING THE DIVISION HAD PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT THE TERMINATION OF [J.G.'S] PARENTAL RIGHTS WOULD NOT DO MORE HARM THAN GOOD FOR [JESSE].

We find J.G.'s arguments to be unpersuasive and affirm for substantially the same reasons set forth by the trial judge in his well-reasoned opinion. See R. 2:11-3(e)(1)(A). We add the following comments.

II.

16                                                              A-2698-18T3

We begin our discussion with the well-settled legal framework regarding the termination of parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test to determine when it is in the child's best interest to terminate parental rights. In order to secure parental termination, N.J.S.A. 30:4C-15.1(a) requires the Division to prove four prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11. The four prongs of the test "are not discrete and separate" but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

Our review of a family judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 413 (1998). "When a biological parent resists termination of his or her parental rights, the [judge's] function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006). The factual findings that support such a judgment "should not be disturbed unless 'they are so wholly insupportable as to result in a denial

18

of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

III.

J.G. first argues that the Division failed to provide sufficient evidence to show that he sexually assaulted Jesse, and the termination of his parental rights was exclusively predicated on his conviction for sexual assault. We disagree and concur with the trial judge's finding that there was ample, credible evidence in the record supporting a finding that J.G. sexually assaulted Jesse. See J.T., 269 N.J. Super. at 188. We defer to those findings. See R.L., 388 N.J. Super. at 89.

We add that the court may consider a parent's criminal conviction in determining whether to terminate his or her parental rights. L.A.S., 134 N.J. at 143. Nevertheless, we conclude that the testimony of Dr. Miller and Jesse, concerning both the extent of J.G.'s abuse and its effect on Jesse, amply supported the conclusion that J.G. endangered Jesse and adversely impacted her

health and development. See N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 435 (App. Div. 2009).

Next, J.G. argues that the trial judge erred in finding that the Division afforded him reasonable services to remedy the circumstances that caused Jesse's removal. He claims that the Division should have provided him with services tailored to address his sexual assault of Jesse, such as psychological treatment or psychosexual evaluations. We disagree.

The Division must show that it has made reasonable efforts to reunite the family by helping the parent correct the conditions that led to the child's removal. K.H.O., 161 N.J. at 354. This may include, but is not limited to

>  (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

"Whether particular services are necessary in order to comply with the diligent efforts requirement must . . . be decided with reference to the circumstances of

the individual case before the court, including the parent's active participation in the reunification effort."  In re Guardianship of DMH, 161 N.J. 365, 390 (1999).  "[W]here one parent has been the custodial parent and takes the primary . . . role in caring for the children, it is reasonable for [the Division] to continue to focus its efforts of family reunification on that custodial parent, so long as [it] does not ignore or exclude the non-custodial parent."  Id. at 393.  Such a course of action may be inappropriate where both "biological parents are hostile to one another."  Ibid.

Particularly, "the Division is necessarily impeded by the difficulty and possible futility of providing services to an incarcerated person."  R.G., 217 N.J. at 557.  In such circumstances, "reasonable efforts may be satisfied when the Division provides services to, and seeks reunification with, the custodial parent from whom the child was removed."  Id. at 558; see N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 242-43 (App. Div. 2010) (finding that, because a father had no relationship with his daughter prior to his incarceration, providing services to him would be futile).  However, "[a]bsent an order under N.J.S.A. 30:4C-11.3, the Division may not ignore requests or avoid providing services to an incarcerated parent."  R.G., 217 N.J. at 558.

Here, the judge relied on ample, credible evidence in finding that the Division's efforts to provide services were reasonable, see J.T., 269 N.J. Super. at 188, and we defer to those findings, see R.L., 388 N.J. Super. at 89.

We comment that the Division was naturally precluded from affording J.G. certain services, such as visitation, by virtue of his incarceration and the no contact order. See R.G., 217 N.J. at 557. Further, as A.G. was Jesse's sole custodial parent at the time she was removed, the Division's efforts were reasonable if they were tailored towards reunification with A.G., not J.G., and that the Division provided A.G. with services to that effect is not in dispute. See R.G., 217 N.J. at 558; DMH, 161 N.J. at 390; T.S., 417 N.J. Super. at 242-43. Moreover, nowhere in the record does it indicate that J.G. ever requested services to remediate his sexual assault of Jesse. Under these circumstances, the Division was required to do no more than it did by meeting with J.G. on a monthly basis and attempting to facilitate both Jesse's visitation and her placement with a paternal family member. See N.J.S.A. 30:4C-15.1(c); DMH, 161 N.J. at 390, 393. In this regard, we concur that the Division's efforts to provide services to J.G. were reasonable.

Finally, J.G. claims that because no bonding evaluation was conducted, and because no evidence was gleaned as to Jesse's well-being in his care or his

22

future unfitness to act as Jesse's parent, the trial judge "erred in finding termination of [his] parental rights would not do more harm than good and was in [Jesse's best interest]." We disagree.

To satisfy N.J.S.A. 30:4C-15.1(a)(4), the Division need not "show[] that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, the issue "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid. The underlying concern of the fourth prong is the child's need for permanency within a reasonable amount of time. J.C., 129 N.J. at 26.

To satisfy this prong, "[the Division] must 'offer testimony of a "well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation" of the child's relationship with both the natural parents and the foster parents.'" A.R., 405 N.J. Super. at 442 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)). A comparative bonding evaluation between a child and her natural parent is generally required because the child's relationship with foster parents "must be viewed not in isolation but in a broader context that includes . . . the quality of

the child's relationship with his or her natural parents." Id. at 439 (quoting J.C., 129 N.J. at 18). There are "very few scenarios in which comparative evaluations would not be required." Id. at 440.

However, "a parent's lengthy incarceration is a material factor that bears on whether parental rights should be terminated. Incarceration may be such a factor based on either abandonment or parental unfitness." L.A.S., 134 N.J. at 143. "[T]he nature of the underlying crime giving rise to incarceration is relevant in determining whether parental rights should be terminated, because it may bear on parental unfitness." Ibid. "[C]rimes of abuse against one's own children that result in substantial injury ordinarily warrant termination of parental rights. They directly violate our laws that authorize the termination of parental rights based on acts of abuse or endangerment[] and are the most extreme and obvious examples of parental unfitness." Id. at 141.

Here, we find that the judge relied on ample, credible evidence in finding that the termination of J.G.'s parental rights would not do more harm than good, see J.T., 269 N.J. Super. at 188, and we defer to those findings, see R.L., 388 N.J. Super. at 89.

We note that J.G.'s incarceration and ineligibility for parole until 2066 are alone sufficient to support a finding that he is unavailable to care for Jesse if his

A-2698-18T3

parental rights were preserved.  See L.A.S., 134 N.J. at 143.  More persuasive, however, is the nature of J.G.'s crime, which overwhelmingly renders him unfit to act as Jesse's parent and warrants termination of his parental rights.  J.G.'s abuse of Jesse not only constituted unfit parenting but caused her substantial injury which, although she may learn to cope with according to Dr. Miller, she will never truly recover from.  See ibid.  We can discern few situations that would offer a greater reason to terminate parental rights than the egregious and sustained sexual assault of a child by his or her parent.

Finally, the claim that a bonding evaluation should have been conducted is without merit.  Undoubtedly, this is one of the few circumstances in which such an evaluation is unnecessary, a matter for which we have not developed a bright-line rule.  See A.R., 405 N.J. Super. at 439-40.  There would be no benefit to Jesse in preserving J.G.'s parental rights, as she wants no relationship with him, and her significant psychiatric problems are almost entirely caused by his actions.  Further, while Dr. Miller did not conduct a bonding evaluation, he nonetheless evaluated Jesse's relationship with J.G. and rendered a report supporting these conclusions.  Under these circumstances, the nature of J.G.'s offense, coupled with Jesse's psychological problems and the expert opinion of Dr. Miller, amply support termination of J.G.'s parental rights.

To the extent we have not specifically addressed any remaining arguments raised by J.G., we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2698-18T3