# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1950-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.R.,

     Defendant-Appellant/
     Cross-Respondent,

and

E.G. and R.W.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.P.H.
and Z.R.H., Minors,

     Respondents/Cross-Appellants.

_____

Argued October 24, 2019 – Decided December 9, 2019

Before Judges Suter and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0164-17.

Bruce Pozu Lee, Designated Counsel, argued the cause for appellant/cross-respondent (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Bruce Pozu Lee, on the briefs).

Rachel E. Seidman, Assistant Deputy Public Defender, argued the cause for respondents/cross-appellants (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Rachel E. Seidman, on the brief).

Erika Carmona Callejas, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason Wade Rockwell, Assistant Attorney General, of counsel; Erika Carmona Callejas, on the brief).

PER CURIAM

Defendant T.R. (Tamara) appeals and her children, Z.R.H. (Zoe) and K.P.H. (Kelly),[1] cross-appeal from a December 13, 2017 final judgment of guardianship terminating parental rights to Zoe and Kelly.[2] Tamara claims the

---

[1] We have used fictitious names for the parties throughout the opinion to maintain their confidentiality. R. 1:38-3(d)(12).

[2] The judgment terminated the parental rights of the children's fathers. They did not appeal the judgment.

Division of Child Protection and Permanency (DCPP) did not prove the statutory requirements under N.J.S.A. 30:4C-15.1(a). The Law Guardian for Zoe and Kelly does not challenge the trial court's finding that Tamara harmed the children, but contends there was insufficient evidence for the trial court's findings under other portions of the statute. We vacate the judgment as to Tamara because the trial court erred by finding DCPP had proven the fourth prong of the best interest test—whether termination of parental rights would not do more harm than good.

## I.

Tamara is the biological mother of Zoe, born in May 2003, and Kelly, born in August 2005. She has two other daughters, who do not live with her. Her son, K.B. (Kevin), born in November 2000, was in DCPP's custody, preparing for independent living. He is not part of this case.

DCPP responded to nearly twenty referrals about Tamara and her children between 2001 to 2015. In 2006, Tamara hit Zoe across her face while they were attending a doctor's appointment. DCPP substantiated[3] Tamara for this physical abuse of Zoe. In 2008 and 2009, DCPP investigated complaints about drug

---

[3] "Substantiated" means DCPP found by a preponderance of the evidence that a child was abused or neglected as defined by N.J.S.A. 9:6-8.21. See N.J.A.C. 3A:10-7.3(c)(1).

abuse, unsanitary living conditions and failure to obtain medical evaluations for Kevin, all of which were unfounded. In 2009, Tamara agreed with DCPP to implement a safety protection plan because her boyfriend physically abused her in front of the children. She then violated the plan by allowing him in the home, and DCPP removed the children for the first time in December 2009. Later, both Zoe and Kelly told their therapist that Tamara's boyfriend sexually assaulted Kelly. DCPP substantiated Tamara for neglect and the family received services. The children were returned to her care in February 2011.

In October 2011, DCPP deemed unfounded allegations of abuse of Kelly by Tamara's brother. Zoe complained that Tamara hit her repeatedly and slapped her in the face, but this was "unfounded" according to DCPP. DCPP investigated a referral in 2014 about the condition of Tamara's home—that it was "nasty" and had little food. Her attendance at group counseling was intermittent. Tamara repeatedly tested positive for marijuana and alcohol. She confirmed she had a bipolar disorder.

In January 2015, DCPP investigated a referral that Tamara's boyfriend was touching Zoe inappropriately. Zoe later admitted that she had not been truthful about the allegation. In early July 2015, DCPP investigated a referral that Tamara had not intervened in a fight between Kevin and Tamara's friend,

A-1950-17T4

Alexandra. Later that month, Tamara again did not intercede when Kevin was involved in a fight with her boyfriend and several of his relatives. DCPP removed the children from Tamara's care for the second time. She was substantiated for neglect after she stipulated to being present and not intervening during both of the fights.[4]

Tamara did not successfully complete the outpatient substance abuse program, testing positive for marijuana and being non-compliant with attendance and services provided. Her participation in a program to treat both her bipolar and substance abuse disorders also was not successful. Although she showed improvement in 2016, she relapsed in 2017. Throughout these periods, Tamara exercised regular visitation with the children. DCPP had no concerns with the visits or Tamara's engagement with her daughters.

In January 2017, DCPP filed a complaint for guardianship seeking to terminate parental rights to Zoe and Kelly. Following a six-day trial in which

---

[4] Kevin exhibited behavioral issues. In 2008, he set fire to a couch in the middle of the night. He was hospitalized because he heard voices telling him to do bad things and was taking medication. He repeatedly addressed Tamara by using the pejorative term, "bitch." He damaged the walls of Tamara's bedroom with a baseball bat, threatened her with a knife, and refused to take his medication. Tamara told a doctor "'I don't give a sh*t about this little piece of crap'; referring to [Kevin]."

Tamara did not testify, the trial court entered a judgment of guardianship terminating parental rights.

DCPP's caseworker testified that the goal initially was reunification but after the children were removed a second time in August 2015 and Tamara continued to relapse, DCPP's goal changed to select home adoption because the children were too young for independent living, and there were no available relatives to adopt them. She testified Kelly did not want to be adopted. If she could not move back with her mother, she wanted to stay at her resource home. Zoe wanted to finish school and move back with her mother. If she had to be adopted, she wanted to get to know the family.

DCPP's adoption supervisor testified that DCPP could locate an adoptive home for both girls and believed their ages, twelve and fourteen at the time of trial, and mental health issues would not prevent their adoption. They were not in an adoptive home at the time. The children would need to consent to adoption because of their ages. If the children were legally freed for adoption, DCPP would conduct a nationwide search for a home.

Kelly testified in chambers. She was living in her third resource home where things were going "great." She did not want her mother's parental rights to be terminated because she loved her mother and did not want to be adopted.

A-1950-17T4

She told the court her "heart will be shattered and twisted . . . into a million pieces[,]" suggesting to the court "we should go home because . . . like I also hurt."

Earlier, in her letter to the trial court, she wrote:

> I miss my mom. If I go home I want a house that is stable. Also that is safe without man [sic] running in and out of the house. Also[,] that make[s] sure [that] I have food to eat. And that make[s] sure I have clean colth[es]. I want my mom to quti [sic] somking [sic]. And make sure we live in a safe neighdorhood [sic] . . . . If all of this don't happen I would still want to go home because I don't want mommy to be alone . . . .

Dr. Samiris Sostre, M.D., conducted a psychiatric examination of Tamara in May 2017. She testified Tamara exhibited acute symptoms of mania, consistent with a diagnosis for bipolar disorder, marked by reported mood disturbance, difficulty sleeping and eating, irritability, and mood swings. She showed a "rollercoaster" of emotions during the interview. Although Tamara claimed to be taking multiple medications that she could not identify, Dr. Sostre testified that these needed to be adjusted, yet Tamara had not sought help. Dr. Sostre concluded Tamara suffers from manic bipolar disorder, cannabis use disorder, post-traumatic stress disorder, and unstable mental illness. She required medication monitoring, counseling and therapy on a consistent basis. Dr. Sostre concluded that Tamara lacked the ability at this time to "appropriately

7

parent her children" because her mental health conditions "interfere[d] with her ability to modulate her emotions, make appropriate judgments and . . . impair[ed] her decision making." Her psychiatric disorders, substance abuse, and poor compliance with treatment plans also interfered with her ability to parent.

Dr. Eric Kirschner, Ph.D., testified about the psychological and bonding evaluations he conducted. Tamara spoke rapidly, and was irritable and agitated during the evaluation. She acknowledged having difficulty sleeping. She described herself as "recovering" from marijuana use. She lacked insight "into how to stabilize her mood, and when her mood is becoming unstable . . . ." She did not take responsibility for the children's removal. She denied receiving any benefit from treatment or counseling, which she described as a "waste of her time." She had a poor attitude about recovery and did not prioritize it. He testified that self-medicating with marijuana was not a long-term solution.

Dr. Kirschner's bonding evaluation concluded that a child-parent bond existed between Tamara and her children although at different levels for Kelly and Zoe. Kelly was happy to see Tamara while Zoe was more reserved. Zoe was reluctant to return to her mother. Kelly felt sad without her mother and preferred reunification to adoption. She wanted to continue to see her mother if

she were adopted. Dr. Kirschner concluded there was a bond between Tamara and the children, but the attachment had "insecure qualities . . . ."

He concluded that both children "would be vulnerable to experience a negative reaction" to termination, but Tamara could not meet their "needs for safety, protection, nurturance, stability, [and] guidance at this time or in the foreseeable future[,]" and that her prognosis to do so in the future was "poor." Because this was the second time the children were removed and it had been two years, he opined that "delay in their achieving permanency . . . had a negative impact on their psychological well-being" and that further delay was "counter-indicated." The children needed therapy to "offset the impact of harm." Another failed reunification with Tamara would be "further harmful or detrimental" to Zoe and Kelly. He agreed with DCPP's plan for select home adoption, concluding that "termination of [Tamara's] parental rights to [Kelly] and [Zoe] will not do them more harm than good as it will give them an opportunity to attain permanence that [Tamara] is not able to provide at this time or in the foreseeable future." He testified the children would be harmed if parental rights were not terminated because they then could not be adopted.

On cross-examination he testified that it would not be "a positive outcome" if the children were legally freed for adoption but not adopted. Both

the lack of adoption and the lack of termination of parental rights were "negative outcomes." He testified, "I think they're both undesirable outcomes. If . . . [I] had to pick one versus the other, I would say that to go through the route of . . . [termination of parental rights] and not getting adopted would . . . probably be more negatively impactful for her." He concluded with his opinion that "giving these children the opportunity to have permanency is what is truly in their best interests."

The trial court entered a judgment terminating Tamara's parental rights to Zoe and Kelly, finding that each prong of the "best interests of the child" test under N.J.S.A. 30:4C-15.1(a) was satisfied by clear and convincing evidence. Under prong one, the court found Tamara harmed Zoe and Kelly by physical abuse, failure to protect them and a general failure to intervene. She also placed the children at risk of harm because of her inability to protect them, her substance abuse and her mental health instability, none of which were likely to improve in the foreseeable future according to DCPP's expert witnesses.

Under prong two, the court found that Tamara was not able to overcome the risks she posed to the children despite therapy, counseling and substance abuse treatment. She continued to test positive for marijuana and alcohol. Her mental health conditions prevented her from being able to parent the children in

the foreseeable future. She did not provide them with a safe and stable home. The court found that delay in providing permanency would add to these harms.

Under prong three, the trial court found that DCPP provided ample services to Tamara to overcome the harms she posed to the children. DCPP provided services to Tamara which "spanned almost a decade," including: "psychological evaluations, psychiatric evaluation, board rate, paternity testing, visitation, substance abuse assessment, substance abuse treatment, homemaker services, follow-up with psychiatrists, MICA referrals, domestic violence counseling and therapy, safety protection plans, Regional Diagnostic Treatment Center evaluations, minimum visitation requirements, individual counseling, Family Preservation Services, family placement assessments and bonding evaluation." The trial court considered other alternatives to termination, such as placement with relatives, Kinship Legal Guardian, independent living, and long-term specialized care, but these options were not feasible for Zoe or Kelly. Independent living was not possible since neither child had reached the minimum age of sixteen by the time of trial.

The court concluded prong four was satisfied although DCPP had not identified a person or family willing to adopt Zoe or Kelly because delaying permanency was "counter[-]indicated at this time." The trial court relied on Dr.

A-1950-17T4

Kirschner's report and testimony. He had concluded that termination of parental rights would not do more harm than good and would give the children the ability to attain permanence that their mother could not provide. The court noted that Kelly wanted to be reunified with her mother "under any circumstance." The court questioned her "maturity to know and understand her own basic needs." The court found the children needed stability and permanency that Tamara could not provide.

The court noted there was no adoptive home identified, but that the "uncontroverted expert opinion" was that the children "will not suffer severe and enduring harm" by terminating their mother's rights. DCPP's adoption supervisor testified "confidently" that DCPP could find a "suitable adoptive home." There was no suggestion the children are not adoptable. The court found the girls deserved a chance at a permanent and stable home, which was not possible with their mother. The court found by clear and convincing evidence that termination of Tamara's rights would not do more harm than good.

On appeal, Tamara contends there was insufficient credible evidence to support the trial court's findings under any of the four prongs. With respect to the fourth prong, Tamara argues the trial court committed legal error by ordering termination without a compensating benefit because there was no parent or

family willing to adopt the children.  She argues the court applied the wrong standard in analyzing the fourth prong and that it drew erroneous implications from the facts.  Tamara argues the first prong was not satisfied because Kevin's behavior was violent and reprehensible.  The court erred by concluding that Tamara was not willing to eliminate harms because it never considered the use of marijuana as a therapeutic remedy.  Under the third prong, she argued that independent living was a viable alternative for the children.

The Law Guardian contends in the cross-appeal that although prong one—harm to the children—was satisfied, termination was not in the children's best interests.  The Law Guardian argues termination would do more harm than good, Tamara should have been given another opportunity to provide a safe and stable home, and the psychiatric services provided to Tamara were inadequate.

## II.

"Our review of a trial judge's decision to terminate parental rights is limited."  N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).  Factual findings that are supported by adequate, substantial and credible evidence "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice[.]'"  Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-

84 (1974) (quoting <u>Greenfield v. Dusseault</u>, 60 N.J. Super. 436, 444 (App. Div.), <u>aff'd o.b.</u>, 33 N.J. 78 (1960)); <u>see</u> <u>also</u> <u>In re Guardianship of J.T.</u>, 269 N.J. Super. 172, 188 (App. Div. 1993).

We must accord substantial deference to the findings of the Family Part due to that court's "special jurisdiction and expertise in family matters . . . ." <u>Cesare v. Cesare</u>, 154 N.J. 394, 413 (1998). Our review is expanded, however, where the error alleged is "in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom . . . ." <u>N.J. Div. of Youth & Family Servs. v. R.G.</u>, 217 N.J. 527, 552 (2014).

A parent has a fundamental right to enjoy a relationship with his or her child. <u>In re Guardianship of K.H.O.</u>, 161 N.J. 337, 346-47 (1999). These rights "are not absolute," but are "tempered by the State's parens patriae responsibility to protect the welfare of children." <u>Id.</u> at 347. The standard by which the rights of the parents and the interests of the State in the welfare of the child are balanced is "through the best interests of the child standard." <u>Ibid.</u> The statute sets forth four criteria that DCPP must prove by clear and convincing evidence. <u>N.J. Div. of Youth & Family Servs. v. F.M.</u>, 211 N.J. 420, 447 (2012).

In considering the first prong of the statutory test, the concern is "whether the parent has harmed the child or may harm the child in the foreseeable future."

N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 113 (App. Div. 2004) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986)). In assessing whether the child has been harmed by the parental relationship, "a parent or guardian's past conduct can be relevant and admissible in determining risk of harm to the child." N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010). DCPP must demonstrate "that the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm." K.H.O., 161 N.J. at 348.

There was no error by the trial judge in finding that Tamara harmed the children and continued to pose a danger to the children's "safety, health or development" as set forth in prong one of the statutory test. She was substantiated for abuse and for neglect. She exposed the children to physical harm, sexual abuse and neglect but took no responsibility for this. She continued to use marijuana and alcohol despite treatment. She did not consider useful the therapy and counseling she obtained to assist her with parenting, to learn how to control her bipolar disorder or to identify when she needed to ask for help. All of these circumstances posed harm or potential harm to the children's safety and health.

Under the second prong, the trial court was required to determine whether it is "reasonably foreseeable that the parents can cease to inflict harm upon the [child] . . . ." A.W., 103 N.J. at 607. The court considers "whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).

We find no error in the trial court's determination based on the unrebutted testimony and reports of Drs. Kirschner and Sostre that Tamara was unable or unwilling to eliminate the harms that caused the children to be removed. The children had been removed from her custody earlier and despite a host of services, she continued to abuse marijuana and did not address her mental health issues. She exposed the children to harm from the relationships that she had with men. Both experts testified that Tamara would not be able to parent her children now or into the foreseeable future.

The third prong under the statute requires DCPP to show that it "has made reasonable efforts to provide services to help the parent[s] correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-

16

15.1(a)(3). With respect to this prong, the trial court's opinion recounted the numerous services provided to Tamara for nearly a decade. The court also considered alternatives to termination of parental rights as required under the third prong analysis. N.J.S.A. 30:4C-15.1(a)(3). Here, DCPP explored other relatives to determine if the children could reside with them, explored kinship legal guardianship but there was no adult over eighteen who could be responsible for the children, and at the time of the trial, neither child was old enough for independent living. We are satisfied the trial court took into consideration all the services offered and the efforts made in trying to place the children in its finding that the third prong of the statutory test was met by clear and convincing proof.[5]

---

[5] Tamara suggests the trial court should have considered whether medical marijuana was an alternative treatment of her bipolar disorder. We are not required to consider this argument because it was not raised before the trial court. See State v. Galicia, 210 N.J. 364, 383 (2012) (providing that "[g]enerally, an appellate court will not consider issues . . . which were not raised below."). If we were to do so, Dr. Kirschner testified that marijuana was not a long-term solution to Tamara's mental health issues. That testimony was unrebutted.

The Law Guardian argues Tamara was not provided with adequate mental health services because her bipolar disorder was not stabilized. It presented no evidence there was treatment that would have done so or that the treatment she was receiving was inappropriate for her disorder. The testimony was that Tamara considered the services provided to be a waste of her time.

Under the fourth statutory prong, the question is whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "Prong four 'serves as a fail-safe against termination even where the remaining standards have been met.'" N.J. Div. Youth and Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008) (quoting G.L., 191 N.J. at 609). "It has been 'suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future.'" Ibid. (quoting A.W., 103 N.J. at 610 (alterations in original) (quotation omitted)).

"[P]ermanent placement with a loving family" is the goal where "reunification is improbable." Ibid. However, "courts have recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." Id. at 109 (citing A.W., 103 N.J. at 610-11). As the Court observed in A.W., "th[is] detriment may be greater than keeping the parent-child relationship intact since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place." 103 N.J. at 611. It requires the trial court to balance the harms suffered from terminating parental rights against the good that will result from terminating these rights. See K.H.O., 161 N.J. at 363; see also A.W., 103 N.J. at 610-11.

In E.P., the issue was whether the mother's parental rights to her thirteen-year-old daughter, who was "psychologically fragile[,]" should be terminated where the daughter had been in seven different foster homes, had an emotional bond with her mother and there was no identified adoptive alternative. 196 N.J. at 109. The Court described the child's hope of adoption as "slim" and "bleak". Ibid. It observed that termination of her mother's rights did "not appear to have any real compensating benefit" based on testimony that the prospect of attaching to another person was "closing real fast." Ibid.

The trial court ordered termination of parental rights so that the child had "at least an opportunity for permanency . . . ." Id. at 110. The Court reversed the decision. It noted that although permanency was the goal, neither the State legislature nor the United States Congress "has stated that the unlikely possibility of permanency in the future should outweigh a strong and supportive relationship with a natural parent." Id. at 110-11.

We part company with the trial court on its finding that prong four was proven by clear and convincing evidence. Prong four is to be informed through expert testimony. See N.J. Div. Youth and Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007). In this case, Dr. Kirschner's opinion was that even though an adoptive alternative had not been identified for these children, termination

would not do more harm than good. He concluded the children would be harmed if they languished without being free for the opportunity to be adopted. Critically, however, he acknowledged if the children were not adopted, the same type of harm would occur; this would be negative for the children in the same way. When asked to compare the harm that would result if parental rights were not terminated and the harm that would occur if there were termination, but no adoption, Dr. Kirschner testified that both outcomes were undesirable but not "getting adopted would . . . probably be more negatively impactful for her." He concluded, however, that "the opportunity to have permanenc[y]" was in the children's "best interests."

The trial court's opinion did not note Dr. Kirschner's testimony that the harm of not being adopted was worse than the harm that could occur if the children were not freed for adoption. It was this testimony that was critical. Dr. Kirschner's testimony on cross-examination did not support the finding that more harm will occur to these children if their mother's rights are not terminated than if they are and they are not adopted. In fact, Dr. Kirschner said the opposite. That a child might be adopted was not enough in E.P. to sever the bond between the child and parent. 196 N.J. at 111. The Court in E.P. reversed the decision to terminate parental rights where the trial court's basis for termination was to

give the child "at least an opportunity for permanency" when there was no "real compensating benefit . . . ." Id. at 109-10.

Here, no adoptive home was identified for Zoe and Kelly. The children are older. They will require therapy. DCPP prefers that they be adopted together, which means that there has to be a family or person willing to adopt both children. The children must consent to adoption. Kelly does not want to be adopted. Zoe is "on the fence" about adoption. The adoption supervisor remained positive the children would be adopted and the court found that to be credible. Even if the adoption supervisor is correct that adoption can occur for these children, the trial court was faced with evidence that, at best, was in equipoise especially in light of Dr. Kirschner's testimony on cross-examination. These proofs were not clear and convincing.

We vacate the judgment only to the extent that it terminated Tamara's parental rights to Zoe and Kelly. We remand this case to the trial court for further proceedings to determine, based on current information, whether the children should be prepared for independent living and whether Tamara should be given an additional opportunity to reunify with the children.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1950-17T4