# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1316-18T4
                A-1318-18T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

N.L.B. and R.S.H.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.A.H.,

      a Minor.

_____

Argued telephonically December 12, 2019 –
Decided January 14, 2020

Before Judges Geiger and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0009-19.

Laura Orriols, Designated Counsel, argued the cause for appellant N.L.B. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Laura Orriols, on the briefs).

Kimberly A. Burke, Designated Counsel, argued the cause for appellant R.S.H. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Kimberly A. Burke, on the briefs).

Christina Anne Duclos, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Christina Anne Duclos, on the brief).

Danielle Ruiz, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Danielle Ruiz, on the brief).

PER CURIAM

In these consolidated appeals, N.L.B ("Nancy") and R.S.H. ("Robert") contest the Family Part's November 7, 2018 final judgment of guardianship terminating their parental rights to G.A.H. ("Grace"),[1] who is currently four years old. Defendants collectively argue that the Division of Child Protection and Permanency ("Division") did not prove all four prongs of the statutory "best

_____

[1] We use fictitious names for Nancy, Robert, Grace, as well as Jill, Amy, Rachel, Tammy, Helen, and Bill, infra, for ease of reading and to protect their privacy. R. 1:38-3(d)(12).

interests of the child" test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supports termination and urges us to affirm the trial judge's decision. After considering defendants' arguments against the record on appeal and the applicable law, we affirm.

I.

At the conclusion of a four-day guardianship trial, Judge Wayne J. Forrest issued a November 7, 2018 opinion comprehensively addressing all relevant facts supporting the court's decision. We have independently reviewed the exhaustive record and we reiterate only those facts necessary to provide context for our opinion.[2]

The Division has been involved with Nancy since January 2011 when she was twelve years old and her mother J.B. ("Jill") contacted the Division about Nancy's misbehavior. Three months later, after Nancy turned thirteen, the Division received an "[a]nonymous" referral about Nancy "cutting herself" and emotional distress and abuse in the home. The Division ultimately closed that case because Jill was seeking services through an alternative provider and Nancy was involved in services at her school.

---

[2] A more detailed discussion of the underlying facts is contained in Judge Forrest's written opinion.

A-1316-18T4

In March 2014, Jill contacted the Division again and requested that Nancy, who was now sixteen, and her seventeen-year-old sister A.L. ("Amy"), be removed from her home based on their poor behavior. The Division opened a case for the family and a caseworker went for a site visit, during which Nancy "admitted to some self-harming behaviors, e.g.[,] cutting and burning herself," and depression.

Through September 2014, the Division provided Nancy with services such as referring her to therapy and life skills classes, helping her seek employment, and providing food stamps and bus passes. Nancy became noncompliant with services around October 2014 when she came home admittedly "high" on a school night while a Division caseworker was meeting with Amy and Jill. Because Nancy and Jill had a declining relationship, a caseworker referred Nancy to a transitional living situation that offered living arrangements and life skills training, but Nancy "wasn't open to participating" as she did not want to live with strangers. Nancy was ineligible to receive independent living stipends from the Division because she was a minor, and the caseworker requested the names of any family members who might be able to offer Nancy housing, but neither Nancy nor Jill provided any names.

A-1316-18T4

By the end of November 2014 and through early 2015, Nancy was living primarily with the family of her friend from school, was more increasingly absent from school, and her compliance with services declined. In February 2015, because the Division already had an open case for the family Nancy was staying with, the Division told Nancy, and Nancy agreed, that she would need to move back in with Jill. Based on information relayed by Amy, the Division was concerned that Nancy was still using marijuana and having unprotected sex.

Nancy told the Division she was pregnant with Grace in late March or early April 2015. The Division promptly began providing Nancy with additional services, including providing her with a list of female reproductive health professionals who would accept her medical insurance, offering assistance in scheduling and attending prenatal appointments, informing her about prenatal vitamins, and offering her parenting classes.

Although Jill initially expressed interest in looking after Nancy and her baby in early April 2015, by the end of the month she changed her mind based on Nancy's behavior. Because the Division was concerned about Nancy's self-care and her lack of follow-through with prenatal appointments, both of which would affect Grace, the Division filed a complaint for Nancy's care and supervision in July 2015, which the court granted.

A-1316-18T4

The Division also recommended Nancy attend a Mommy and Me program where she could remain in school while living with her child, which she consistently rejected. While Nancy was pregnant, a Mommy and Me program had an opening, but Nancy refused to attend the meet and greet where she would have been considered for admission. Had Nancy attended such a program, she would have received continuing instruction and supervision on how to care for a newborn, as well as substance abuse treatment, and counseling services.

Meanwhile, between April and October 2015, Nancy was infrequently attending her referred services and was also missing school. She also consistently declined to attend Mommy and Me programs. In May 2015, she attended a psychological evaluation to assess her mental health and future ability to care for a child. During the evaluation, Nancy admitted she had anger management problems, suicidal ideations, self-harming behavior, depression, panic attacks, and high anxiety. She also reported that she had a history of sexual and physical abuse while living with Jill and other family members. The psychologist recommended that Nancy be referred for parenting skills classes, individual psychotherapy, a psychiatric evaluation, and a Mommy and Me program.

As of June 2015, Nancy was unemployed, having lost her part-time job. In July 2015, Nancy informed a caseworker that prenatal vitamins made her sick, and that she sometimes forgot to take them. After a visit, the Division caseworker became concerned about Nancy not receiving prenatal care and her failure to adequately prepare for the baby's arrival, so the Division sent letters to local hospitals advising them of Nancy's pregnancy, and arranged transportation services for Nancy to get to and from the hospitals.

Grace was born on October 30, 2015, and was Nancy and Robert's first child. Nancy would not disclose to the Division who the baby's father was prior to Grace's birth. For the first few days of Grace's life, Grace, Nancy, and Robert lived with Robert's mother T.H. ("Tammy"), who had been substantiated by the Division for abuse or neglect twice before, one of which involved her "hitting a [young] child in the head with a bat," resulting in criminal charges.

During a visit to Tammy's home on November 2, 2015, Nancy told a caseworker she "wasn't sure" how much sustenance Grace was consuming and estimated that Grace was consuming "almost half of the bottles," and stated Grace would sleep on Nancy's chest, which the caseworker advised was not safe. Consistent with Tammy's desire, the caseworker informed Nancy that she and Grace needed to return to Jill's home.

On November 4, 2015, the Division learned from Nancy's therapy worker that she had not returned home with Grace in accordance with the plan they established. Further, Nancy did not return phone calls from her school-based programs, and Jill informed the Division that she had not spoken with Nancy since November 2, 2015. A caseworker got in contact with Tammy, who stated that Nancy was still with her, but that she was going to return Nancy to Jill's home. Upon locating Grace, the Division executed a Dodd removal[3] that day, November 4, 2015.

After the Dodd removal, the Division filed a verified complaint for custody of Grace in which it alleged that Nancy had not made progress in preparing for Grace's birth. More specifically, the Division first emphasized that both Nancy's and Robert's families were involved with the Division and specifically that Robert's mother Tammy was substantiated twice for physical abuse against her children. The Division stated that it also had concerns regarding Nancy's poor attendance at school and the inability of her mother to provide adequate financial support for the family.

---

[3] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act," N.J.S.A. 9:6-8.21 to -8.82. N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

A-1316-18T4

The Division also noted that Nancy had undergone a psychological evaluation prior to Grace's birth where she admitted to depression, suicidal thoughts, poor appetite, past anxiety and panic attacks, and self-harming behavior such as cutting, burning, and punching herself, which continued at the time of the evaluation. Despite her admissions, Nancy did not pursue the recommendations in the doctor's report considered necessary for her to capably parent a child. To support its contention that Nancy was ill-prepared to parent a newborn, the complaint referred to the Division caseworker's finding that Nancy did not have enough bottles to accommodate a newborn baby and that she possessed a car seat not suitable for a newborn. Furthermore, Nancy had yet to enroll in a Women, Infants and Children Nutritional Program ("WIC") to ensure she had sufficient supplies for her baby upon birth, and she failed to provide proof of attendance at her pre-natal medical visits and that she was taking her prescribed pre-natal vitamins.

At a subsequent meeting with Nancy, Tammy, and Amy less than a month before Grace was born, the Division learned that Nancy also had yet to file paperwork for home instruction from school once the baby was born, and had still not applied for WIC. Nancy and her mother attempted to visit the welfare office to arrange for medical insurance for the baby and food stamps, but Nancy

refused to cooperate and failed to provide her school schedule which was necessary to complete the application process. At the same meeting, the Division also addressed Nancy's failure to show up to parenting education classes and the Trenton Central High Parent Linking Program that the court ordered her to attend.

After considering the testimony of a Division supervisor who testified that the Division felt it was in the best interest for Grace to be removed because Nancy did not "complete those services [that were recommended to her] in order to better parent [Grace] when she was born," the court approved the removal of Grace and her placement with her resource parents H.D. and B.D. ("Helen" and "Bill"). The court specifically found that Nancy failed "to comply with and did not take the necessary precautions and necessary classes in order to ensure that she was capable of caring for [Grace]." The court also determined that the removal was necessary to avoid any "ongoing risk to the life, safety, and the health of the child" due to the "noncompliance with the services that were required in order to ensure that [Nancy] was prepared to take care of the child."

With respect to Robert, the court found based on the testimony of the Division supervisor that he was "living with his mom[] and . . . Robert is not a suitable candidate for the child because there [were] substantiated . . .

10

complaints in his [mother's] home." The court concluded that the Division made reasonable efforts to ensure that Nancy was prepared to care for Grace, but she did not take advantage of offered services. The court also found the Division made reasonable efforts to place Grace with Robert but were unable to do so as he was living with his mother.

At a hearing on November 17, 2015, the court affirmed its decision to grant the Division custody of Grace. Nancy again stated at that hearing that she was not interested in participating in a Mommy and Me program. The court implemented services for both Nancy and Robert, along with visitation, with the clear goal of reunifying them with Grace.

Immediately after Grace's removal, a Division caseworker also learned that Nancy was not attending recommended therapy. During Nancy and Robert's first visit with Grace after the Dodd removal, Nancy told a caseworker that she stopped attending therapy because a therapy worker said all of the services were voluntary. Days later, a caseworker met with Nancy and Robert to discuss what they had to accomplish to achieve reunification. Nancy was advised she needed to participate in life skills training, a psychiatric evaluation, a substance abuse evaluation, parenting classes, an Intensive Services Program ("ISP"), and after-school based program on Thursdays, and a parenting program on Fridays. The

caseworker also told Robert that he needed to participate in a fatherhood program, attend a substance abuse evaluation, and attend parenting classes at ISP.

On November 9, 2015, Tammy told the Division that she took Robert to the fatherhood program to sign up for classes, but that they needed to return to fill out intake forms. A few weeks later, the Division learned that the fatherhood program did not have Robert's information on file. Robert claimed he signed up for the fatherhood program, but during a visit on November 24, 2015, Robert could not provide the name of the person to whom he had allegedly spoken with.

Also, that November, Tammy requested that the Division assess her and her cousin as a possible placement option for Grace. Tammy did not provide any information about her cousin, but the Division discovered that Tammy was dismissed from a prior litigation for not complying with services after being established for hitting her grandchildren. Tammy was thereafter not allowed to have unsupervised contact with Grace until she engaged in services.

Jill also expressed an interest in being a possible placement option for Grace. The Division, however, was concerned that Jill was not supporting Nancy, as Nancy stated her mother made her feel uncomfortable, and Jill had an outburst in court where she cursed and yelled at a caseworker.

Throughout November and December 2015, Nancy and Robert remained unemployed, and Nancy was living with Jill. On December 10, 2015, the Division transported Nancy to a psychiatric evaluation with Sonia Oquendo, M.D. Dr. Oquendo recommended that Nancy be referred to a psychiatrist for regularly scheduled appointments, receive medication treatment, individual psychotherapy, undergo a substance abuse evaluation, and attend parenting classes. Nancy and Robert attended an intake at ISP that December and signed up to participate in a parenting group, counseling, and supervised visitation with Grace, which they attended once a week.

With respect to visitation, Nancy and Robert attended all scheduled supervised visits that December where they had mostly positive interactions with Grace. Beginning in 2016, however, Nancy and Robert started experiencing difficulty with their visits. Nancy and Robert fought during one visit with Grace, and during a different visit, Nancy pushed Robert after he asked her to watch Grace while he went to retrieve something. By the end of 2016, ISP wanted to end supervised visitation at their facility because of Nancy and Robert's inability to successfully co-parent which prevented them from benefitting from the program. ISP also noted that Nancy and Robert often clashed with one another, did not show up with appropriate childcare products

13

for Grace, were frequently late, or failed to show up at all to their supervised visits with Grace even after she had already been transported.

Throughout 2017, Nancy and Robert were again regularly late, or failed to show up at all, to a number of visits with Grace. The Division, accordingly, implemented a twenty-four-hour confirmation policy but Nancy and Robert, nevertheless, continued to miss scheduled visits. The inconsistent appointments persisted through the year and began to have noticeably negative effects on Grace.

For example, Robert and Nancy arrived one hour late to a visit with Grace only after giving the visit supervisor multiple excuses over the phone about their tardiness. Grace was frustrated and cried during the hour that they were not at the visit. Additionally, they failed to attend a visit after Grace was already taken to a local fast food restaurant. When the caseworker attempted to leave with Grace after waiting for their arrival, Grace began to cry and did not want to leave without seeing them.

Though Nancy and Robert attended all scheduled visits in February 2018, their visits were similarly sporadic throughout the remainder of 2018, which continued to negatively affect Grace. For example, before she was transported to an April 2018 visit, Grace grew upset that she had to leave her resource

mother and asked the resource mother to go with her. In June 2018, Robert also showed up an hour late to a visit with his new girlfriend, and hurriedly played with Grace staying for only fifteen minutes. After Robert walked out of the visit, Grace stood by the window crying as she watched Robert and his girlfriend sit in their car for an additional five minutes before leaving. From July until September 2018, Nancy and Robert continuously missed visits, showed up late, and failed to call in advance to confirm their attendance.

In addition to the aforementioned issues regarding Nancy and Robert's consistent visitation with Grace, the Division became concerned because between January and June 2016, Nancy was not attending school consistently. Furthermore, by February 2016, Nancy and Robert had only participated in two parenting sessions even though they should have completed four weeks of classes at that point.

In February 2016, Robert also attended a psychological evaluation with Jamie Gordon-Karp, Psy.D., where he stated that he was not opposed to corporal punishment. Dr. Gordon-Karp recommended that Robert attend individual therapy, secure housing and employment, participate in a Fatherhood Program, continue to visit with Grace and attend a psychiatric evaluation. As of April 2016, Nancy and Robert had not completed a parenting program.

A-1316-18T4

In August 2016, Nancy and Robert's second child died after being born premature. A month later, the Division learned that Nancy and Robert were smoking marijuana, so a caseworker asked them to provide a urine sample for drug testing. Both samples were positive, with Robert testing with high levels, and Nancy with low levels.

As of October 2016, Nancy was attending counseling and visitation at ISP, but had missed four therapy sessions. Robert never began attending counseling at ISP, and only attended visitation with Grace. The Division reported, however that Nancy was not making herself consistently available for therapy despite several attempts by her therapy caseworker to contact her. Based on their lack of progress, a caseworker told Nancy and Robert that the Division was going to request the permanency plan be changed to termination of parental rights followed by adoption.

After both Robert and Nancy missed several appointments to address their substance abuse issues in the first half of 2017, Nancy finally began consistently attending a treatment center for substance abuse services in May of that year. The following month, the Division referred Robert and Nancy to another parental fitness evaluation with Jonathan H. Mack, Psy.D., which they both attended.

Dr. Mack concluded that Robert could only be a minimally effective parent if he complied with substance abuse treatment recommendations, completed substance abuse treatment, and tested negative for marijuana for at least six months, and if he obtained steady employment and stable and appropriate housing. Robert admitted to Dr. Mack that he was using marijuana as recently as one month before the evaluation. Dr. Mack recommended that Nancy participate in a drug rehabilitation program, obtain independent housing, and find steady gainful employment.

As of August 2017, Nancy and Robert were scheduled to begin therapy, parenting skills training, and a psychiatric assessment. While Nancy began to comply with services, Robert was unable to receive services until he began substance abuse treatment.

In September 2017, Nancy successfully completed her substance abuse treatment and was discharged from the program. Robert, however, did not comply with substance abuse services for the entirety of 2017, and was discharged twice, once in June 2017 and once in September 2017, for non-compliance. By December 2017, Nancy was living with Amy, and Robert and Nancy were reporting that they were working at Amazon.

The termination of parental rights trial was originally scheduled for May 2018, but in January 2018, a caseworker told the resource parents that they were still looking to reunify Nancy and Grace. In January 2018, Nancy was attending trauma-based therapy and parenting classes while residing with Amy. Nancy, however, was still not prescribed any medication to address her depression, post-traumatic stress, and panic disorders because she failed to obtain the proper bloodwork. Nancy told a caseworker that her therapist stated that taking the medication was a choice, and that she was having issues getting her medication filled because of her lack of insurance. Nancy also stated that the therapist was providing her with medication samples.

On January 3, 2018, David Brandwein, Psy.D., conducted a bonding evaluation of Grace with her resource parents, Bill and Helen. During the evaluation, Grace referred to Bill as "daddy" and to Helen as "mommy." Bill and Helen interacted positively with Grace and played with her throughout the entire evaluation.

As of February 5, 2018, Nancy was attending therapy regularly, living with Amy, and reported to be motivated to reunify with Grace. Although Nancy was continuing to attend therapy, she had still not completed her bloodwork to begin receiving medication. A February 8, 2018 progress report revealed that

Nancy missed a therapy session on January 17, 2018, because she was in the hospital, but missed another one on January 31, 2018, for no excused reason. At that time, Nancy still did not have medical insurance and failed to keep all of her therapy appointments. Robert also began to attend therapy that February but was only attending group sessions.

Nancy missed seven therapy appointments throughout May and June of 2018, and as of August 15, 2018, Nancy had not attended therapy services since July 11, 2018. Nancy resumed therapy on August 15, 2018, and her provider recommended that she attend therapy bi-weekly in hopes that it would encourage her to attend more frequently.

On August 21, 2018, Barry Katz, Ph.D., conducted a psychological evaluation of Nancy and a bonding evaluation of Nancy and Grace. During Nancy's psychological evaluation, she admitted to having problems with anxiety and substance abuse issues. Nancy denied that she was currently prescribed any medications or that she had ever been prescribed medications. Nancy told Dr. Katz that she was currently working as a cashier, but that she was training for employment at Amazon. Nancy also told Dr. Katz that she was living with her best friend and her best friend's family in a six-bedroom home where she would

like Grace to move in with her. Additionally, Nancy stated that she planned to move out with Grace to their own apartment by her birthday next year.

Nancy told Dr. Katz that it was unfair that she has been told she is unfit to parent because she has never been given the chance to parent. Dr. Katz testified at trial that Nancy demonstrated a weakness in the understanding of child development. Additionally, Dr. Katz stated that Nancy likely does not consistently engage in services because she does not understand that problems exist. Dr. Katz also concluded that the Division provided appropriate services for Nancy, but that she failed to comply fully.

Robert attended his psychological and bonding evaluation with Dr. Katz the following day. Robert told Dr. Katz that he last worked in May 2018, and that he stopped working due to not having stable transportation. Robert admitted that Grace is bonded with her resource parents.

Dr. Katz testified that Robert knows and understands what is expected of him to parent, but that Grace has an insecure attachment with him. In his report, Dr. Katz stated that Robert has had "continued instability with income, stable housing[,] and meeting [Grace's] needs." Additionally, Dr. Katz opined that Robert has an underlying personality disorder that continues to affect Robert's

parenting. Dr. Katz concluded that his evaluation supports a permanency plan of termination of parental rights followed by adoption.

At trial, the Division relied upon the testimony of three Division caseworkers, and expert witness Dr. Brandwein. In supporting the Division's request to terminate Nancy and Robert's parental rights, the Law Guardian presented and relied upon the testimony of Dr. Katz. Both Nancy and Robert testified at trial.

In a comprehensive and detailed 102-page written opinion, Judge Forrest found the Division proved, by clear and convincing evidence adduced during the four-day trial, all four prongs of N.J.S.A. 30:4C-15.1(a). This appeal followed.

## II.

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . . ,' and 'rights far more precious . . . than property rights.'" Stanley v. Illinois, 405 U.S. 645, 651 (1972) (internal citations omitted). "[T]he preservation and

strengthening of family life is a matter of public concern as being in the interests of the general welfare." N.J.S.A. 30:4C-1(a); see also K.H.O., 161 N.J. at 347.

The constitutional right to the parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[See also A.W., 103 N.J. at 604-11.]

III.

A.    Prong One

As to prong one, the court found that "[b]oth parents have shown that their conduct places Grace in a position where she suffered harm and is at a risk of harm."    In this regard, the court concluded that due to "Nancy's and Robert's failure to obtain stable employment, appropriate housing, attend visitation with Grace consistently, engage in appropriate behavior with Grace and complete the required services, Grace's safety, health or development have been and would continue to be endangered by a parental relationship with Nancy and Robert." These findings are amply supported by the record.

By way of example, Dr. Brandwein provided unrebutted expert testimony that although Grace enjoyed her time with Robert and Nancy, she did not look to them to fulfill her needs.  Robert also told Dr. Brandwein that he had not complied with substance abuse evaluations or treatments since January 2018. Dr. Brandwein concluded in his report that severing the relationship between

Grace and her resource parents was "clinically contraindicated" as it would lead Grace to endure "psychological harm in the form of poor psychosocial, behavioral, and emotional outcomes" and would "break [Grace's] first bond with adult caregivers and leave [her] psychologically adrift, without a stable caregiver to meet her physical and emotional needs."

Dr. Katz similarly stated in his report that when Nancy and Robert failed to attend or showed up late for visits, which happened frequently, Grace ultimately suffered. As noted, since Grace's removal, both parents' visits with Grace were wholly inconsistent, which led to Grace's visible distress during visits when they were late or failed to attend and caused Grace to eventually suffer separation anxiety when she would leave her resource parents. In addition, Dr. Katz stated that neither Nancy nor Robert would be able to overcome their personality deficits to parent Grace safely and consistently. Dr. Katz feared that if Grace returned to Nancy or Robert, "the parental responsibility and stress would overwhelm each biological parent and result in increased risk of neglect and additional emotional trauma for [Grace]." Dr. Katz concluded that termination of parental rights "would do more good than harm for [Grace]."

24

As the trial court noted, the Division need not wait for a child to suffer actual physical harm for purposes of prong one, which focuses on "endanger[ment]" to the child. See N.J.S.A. 30:4C-15.1(a)(1); In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) ("a delay in establishing a stable and permanent home" can constitute endangerment that "will cause harm" to a child); New Jersey Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001) ("Neither [parent] has harmed the child, nor is there any evidence to show that they would intentionally harm the child. But that is not the test."). The court granted multiple extensions to allow Nancy and Robert additional time to resolve the issues resulting in Grace's removal, however, both parents failed to comply with the Division's appropriate requirements that would permit Grace to be safely reunified with them. Thus, we are satisfied that the Division established prong one clearly and convincingly.

B.    Prong Two

As is often the case, the findings regarding the first prong informed and overlapped the second. See N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). In concluding that the Division clearly and convincingly established prong two, the court explained:

> This Court finds that it is evident that Nancy and Robert are unwilling or unable to nurture and care for Grace.

Nancy and Robert have shown this through their inability to remediate their mental health issues, learn how to properly parent, engage in stable employment, and find appropriate and safe housing. Thus, prong two of the best interest of the child standard is satisfied with respect to Nancy and Robert, as they are unwilling or unable to eliminate the harm facing their child as well as are unable or unwilling to provide a safe and stable home for their child. Furthermore, delaying permanent placement will add to the harm that the child has already suffered, as Grace has been in placement since November 4, 2015 and deserves permanency, which can be achieved with their current resource home. Moreover, Dr. Brandwein and Dr. Katz agreed as to this and there is no other expert opinion to the contrary. Accordingly, this Court is firmly convinced by clear and convincing evidence, that the Division has proven prong two.

These findings are also supported by the record. Indeed, even before Grace was born, the Division was involved with Nancy out of concerns about her mental health, as she had self-harming tendencies. Neither Nancy nor Robert were able to obtain steady employment or stable housing throughout Grace's entire life. In this regard, for three years prior to the guardianship trial, Nancy and Robert failed to obtain stable employment necessary for appropriate housing and have failed to fully comply with services necessary for reunification. As Dr. Brandwein concluded, severing Grace's relationship with Bill and Helen would lead to enduring psychological harm in the form of poor

psychosocial, behavioral, and emotional outcomes which neither Nancy nor Robert can mitigate.

Further, as noted, neither Nancy nor Robert consistently attended visits on time. Additionally, the Division was unable to provide Robert and Nancy with housing assistance because they never provided the Division with necessary proof of stable employment. Dr. Brandwein testified that both Nancy and Robert are dismal candidates to parent Grace and reported that no expert who has evaluated Nancy and Robert has recommended reunification due to Nancy and Robert's mental health, substance abuse related issues, and housing concerns. Dr. Brandwein also stated that Nancy has not made significant changes over a long period of time, and that she has not resolved her long history of mental health issues or her housing and employment instability. With respect to Robert, Dr. Brandwein believed that he has not prioritized Grace and her needs throughout the litigation, and instead has been focused on his own chaotic lifestyle.

Dr. Brandwein further testified that Grace has a secure and significant bond with Helen and Bill, as Grace now depended on them for physical and psychological safety, and comfort when she needed something. As to Nancy and Robert, Dr. Brandwein also testified that "those same bonds didn't develop

for either parent," likely due to the inconsistency in visits and the extended period of time apart from their care. Given that neither Nancy nor Robert have been able to mitigate the harm facing Grace, obtain steady employment or stable housing over the course of her entire life, the record firmly supports the court's finding that prong two was established by clear and convincing evidence.

C.     Prong Three

As to the third prong, the court found that "the Division has made numerous and continuous efforts to provide services to Nancy and Robert in order to reunify them with Grace." Again, the record amply supports this finding as the Division provided defendants with psychological evaluations, parental fitness evaluations, psychiatric evaluations, parenting classes, individual therapy, bus passes for visitations, transportation to their evaluations, offers to participate in a Mommy and Me Program, substance abuse evaluations and treatment, and one on one meetings with caseworkers. Nancy was also provided with a therapy caseworker, a school-based parenting and therapy program that the Division helped start at her school, and life skills training. Similarly, the Division provided Robert with a referral to a fatherhood program.

Prong three also requires the court to consider alternatives to termination of parental rights. Since the resource parents were willing to adopt Grace,

kinship legal guardianship was not available as an option in this case. Independent living was also not feasible because, as a Division caseworker testified, such an arrangement requires that the parents also demonstrate that they are responsible enough to handle money, are psychologically stable enough to deal with living alone, and must comply with other recommended services that the Division requires. The record consistently shows that both parents failed to meet that standard as they continuously failed to comply with services. Also as noted, Nancy rejected Mommy and Me programs.

Further, contrary to Robert's argument that the Division did not properly investigate alternative caretakers, the record supports the court's determination that the Division met its burden, as the Division assessed multiple family members as potential placement options for Grace including Jill, Tammy, and Tammy's cousin, among others, after exhaustively attempting to reunify Grace with Nancy and Robert.

The Division ruled out both the paternal and maternal grandmothers. Robert's mother Tammy had a substantiated history with the Division and could not care for Grace unsupervised. Nancy's mother Jill expressed an interest in being a possible placement option for Grace, however, Nancy stated that she made her feel uncomfortable, and Jill had yelled and cursed at a Division

caseworker in court. The Division also provided a rule-out letter to Nancy's sister, Amy, who was evaluated as a potential placement, but, similar to Jill, she resided in a one-bedroom apartment.

With respect to the paternal grandfather, both Nancy and Robert were living with him while he was being assessed, preventing Grace from being placed in the home. Furthermore, Robert indicated in his psychological evaluation with Dr. Brandwein that he could not be reunified with Grace in his father's home because "his father is older and cannot care for [Grace] while he works" and that though his niece and nephew lived at his father's home, "this was not an option for [Grace]." Robert also indicated to Dr. Brandwein that his grandmother lives in his father's home, but she was not suitable for placement due to having a stroke and not being able to take care of Grace.

The Division also contacted Robert's cousin to determine if she was a suitable placement for Grace. The record indicates that a Division supervisor initially spoke to Robert's cousin soon after Grace was removed from Nancy's care regarding concerns about a final restraining order she filed against her mother, as well as an active warrant from 2010 that remained unresolved. Robert's cousin told the supervisor that she would call her back once she resolved the issues, but there is no evidence in the record to suggest that she

contacted the Division after that conversation. Furthermore, according to testimony from a Division caseworker at trial, Robert's cousin was never present at any of the visits with Grace she supervised, and Robert did not reintroduce her as a potential placement until two weeks prior to trial. Accordingly, the court's finding that the Division proved prong three by clear and convincing evidence is firmly supported by the record.

D. <u>Prong Four</u>

In considering the fourth prong, the trial judge found that "there is no realistic likelihood that [Nancy or Robert] will ever be able to safely and appropriately care for their child now or in the foreseeable future." In this regard the court explained:

> [Nancy and Robert] are clearly unable to provide [Grace] with a safe and stable home and the permanency she so desperately needs and deserves. The termination of the parental rights of [Nancy and Robert] would certainly not result in more harm than good for [Grace]. Based on all the evidence and testimony presented, there is no probable expectation in the ability of [Nancy or Robert] to make the changes necessary to provide their child with a safe and stable home given their substance abuse and mental health issues, and their inability to obtain stable housing and employment. Moreover, Dr. Brandwein and Dr. Katz both agree as to this and there is no other expert opinion to the contrary.

These findings too are fully supported by the record. When asked "[w]hich relationship is stronger [between] the relationship Grace has with the resource parents or with her biological parents," Dr. Katz identified the relationship with Grace's resource parents. Dr. Katz also testified that delaying permanency would harm Grace in several ways, and that Grace had an "insecure attachment" to Robert and Nancy, which meant that it would be "problematic" for her to rely on them as primary caregivers.

Dr. Katz testified that termination of parental rights would not do more harm than good, as the "lack of consistency that [Grace] is having now with the visitation . . . [is] one of the psychosocial stressors . . . leading to insecure attachments" and the court would be traumatizing Grace by "severing her relationship to her known primary nurturing figures." Dr. Katz emphasized in his testimony that the court would then be "transitioning [Grace,] who would be . . . traumatized[,] to the care of parents who have shown deficits in parenting, even minimal parenting ability, for over three years . . . who have not met [Grace's] needs under the best of circumstances."

Dr. Brandwein characterized Robert and Nancy as "dismal" candidates for reunification with Grace. Dr Brandwein testified that it would place Grace's physical and emotional safety at risk to return her to Nancy's care. He also

32

testified that Grace did not look to Robert to fulfill her needs. Rather, Dr. Brandwein expressed fear that if Grace was reunified with Robert, she would suffer physical and emotional harm. He noted that there have been numerous services offered to Nancy and Robert over a three-year period and Dr. Brandwein "[does not] know that there are any other services right now or in the foreseeable future, that would result in different outcomes because it does not seem . . . that [Nancy and Robert] want to make changes in their lives, that would support [Grace] being placed with them."

He also testified that, "given the fact that [Grace] has been in foster care for so long and, has developed this rather significant positive bond with her resource parents, [her] best interests are remaining there." Dr. Brandwein explained that the risk of harm from severing Grace's relationship with Nancy and Robert was "infinitesimal," as Grace "does not look for them to fulfill parental functions on a consistent basis" and concluded, similar to Dr. Katz, that termination of parental rights "would clearly do more good than harm."

IV.

We also briefly address Nancy's argument that Grace was unjustifiably

removed from her custody on November 4, 2016.[4]  Nancy argues on appeal that the initial Dodd removal was unwarranted because "the facts clearly show that there was no danger to the baby, imminent or otherwise," and that the court erred in upholding the Dodd removal "without the requisite proof of imminent danger and without competent evidence or factual findings indicating abuse or neglect." We disagree.

N.J.S.A. 9:6-8.29 allows for emergency removal without court order if there is imminent danger to the child's life, safety, or health, and there is insufficient time to apply for a court order.  Within two court days of emergency removal, the Division must file a complaint pursuant to N.J.S.A. 9:6-8.30(b), along with an order to show cause.  Pursuant to N.J.S.A. 9:6–8.31(a), the "safety of the child shall be of paramount concern" at the initial hearing.  "[I]f the court finds that continued removal is necessary to avoid an ongoing risk to the child's life, safety, or health, it shall affirm the removal of the child to an appropriate place."  N.J.S.A. 9:6-8.31(b).

Here, the record shows that Grace was properly removed because the Division provided sufficient evidence to substantiate the claims in its complaint

---

[4]  We note that Nancy's merits brief fails to include a point heading addressing this specific argument as required by Rule 2:6-2(a)(6).  We glean this argument from the body of her brief.  Robert does not raise this issue on appeal.

that Nancy's repeated failure to comply with court-ordered services placed Grace in an environment where her safety and health were in imminent danger.

More specifically, Nancy's refusal to enter a Mommy and Me program, her non-compliance with services, and concerns regarding her mental health were significant and legitimate concerns warranting the Division's actions. Nancy's behavior, both leading up to the Grace's birth and immediately after, demonstrate her continued non-compliance with recommendations and directions that the Division deemed necessary for Grace to remain in Nancy's care. Thus, the record amply supports the court's determination that Grace's removal was necessary to "avoid any ongoing risk to the life, safety, and the health of [Grace]" due to Nancy's "noncompliance with the services that were required in order to ensure that [she] was prepared to take care of [Grace]."

## V.

After our thorough consideration of the record, including the positive collaterals, we conclude that the trial judge's findings were clearly and convincingly supported by the evidence and are entitled to our deference. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare v. Cesare, 154 N.J. 394, 413 (1998). We therefore affirm substantially for the reasons set forth by Judge Forrest in his well-reasoned and thoughtful written

opinion. To the extent we have not specifically addressed any of defendants' remaining arguments it is because we find them to have insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1316-18T4