# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3820-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANANCY,

     Plaintiff-Respondent,

v.

M.P.,

     Defendant-Appellant,

and

J.S.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.S.,
a minor.

_____

Argued September 15, 2021 – Decided October 15, 2021

Before Judges Hoffman and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0021-20.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ryan T. Clark, on the briefs).

Mary L. Harpster, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Mary L. Harpster, on the brief).

David Valentin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; David Valentin, of counsel and on the brief).

PER CURIAM

Defendant M.P. (the mother) appeals from a May 28, 2020 Family Part order terminating her parental rights to her son M.S. (the child), born in 2012, and awarding guardianship to the Division of Child Protection and Permanency (the Division).[1]  Judge Michael C. Gaus presided over the guardianship trial, entered judgment, and rendered a ninety-page opinion.  Defendant contends the Division failed to satisfy its burden at the trial. After carefully reviewing the

---

[1] The child's father voluntarily surrendered his parental rights and is not a party to this appeal.

record, we affirm substantially for the reasons explained in the trial judge's comprehensive and detailed written opinion.

Judge Gaus aptly characterized the circumstances of this case as "heartbreaking." The child is diagnosed with autism and attention deficit hyperactivity disorder (ADHD). He is essentially non-verbal and requires significant care for his special needs. Before his removal by the Division, the child lived with defendant and her mother (the grandmother). Both have intellectual challenges that place them in the "[e]xtremely [l]ow range" of cognition.

As a result of defendant's profound cognitive impairment, she is unable to fully understand the child's limitations, leading her to use inappropriate levels of physical and emotional discipline, including corporal punishment. She admitted to the Division that she intends to "use the hand" to raise the child because that is how she was raised by her own mother—the grandmother. Defendant stated, "[t]here's no way of changing. I can't hold back with not hitting him anymore."

Relatedly, defendant does not appear to understand how her actions led to the child's removal, as shown, for example, by her relationship with her boyfriend, who is a registered sex offender. She falsely told the Division she

3

had ended the relationship, later admitting to a therapist that they were still living together but keeping their relationship "hush hush."

On appeal, defendant argues:

[POINT I]

THE TRIAL COURT'S FINDINGS WERE INCOMPLETE AND INADEQUATE TO SUSTAIN A JUDGMENT TERMINATING [DEFENDANT'S] PARENTAL RIGHTS BY CLEAR AND CONVINCING EVIDENCE AS REQUIRED BY N.J.S.A. 30:4C-15 AND 30:4C-15.1.

[POINT II]

THE TRIAL COURT ERRED IN FINDING THAT DCPP DEMONSTRATED BY CLEAR AND CONVINCING EVIDENCE THAT [THE CHILD'S] HEALTH AND DEVELOPMENT HAS BEEN OR WILL CONTINUE TO BE ENDANGERED BY THE PARENTAL RELATIONSHIP UNDER THE FIRST PRONG. [THE CHILD] WAS SUCCESSFULLY PARENTED BY [DEFENDANT] UNTIL HIS REMOVAL BY DCPP. DESPITE REMOVING [THE CHILD] FROM [DEFENDANT] DUE TO A SINGLE HAND SLAP, DCPP DOCUMENTED THAT [HE] WAS NEATLY DRESSED, WELL GROOMED, "LAUGHING" AND GIVING DCPP INVESTIGATORS HIGH FIVES. SELF-EVIDENTLY, THE SON WAS NEVER HARMED BY [DEFENDANT].

[POINT III]

THE TRIAL COURT ERRED IN FINDING THAT DCPP DEMONSTRATED BY CLEAR AND CONVINCING EVIDENCE THAT [DEFENDANT]

4

WAS UNWILLING OR UNABLE TO ELIMINATE THE ALLEGED HARM FACING [THE CHILD] OR IS UNABLE OR UNWILLING TO PROVIDE A SAFE AND STABLE HOME FOR HIM AND THE DELAY OF PERMANENT PLACEMENT WILL ADD TO THE HARM UNDER THE SECOND PRONG.

A. DCPP'S OWN SERVICE PROVIDERS AND TRIAL EXPERTS PROVE THAT [DEFENDANT] CAN REUNIFY HER SON AND TREAT HIS AUTISM. BY THE TIME OF TRIAL, DCPP DOCUMENTED THAT [THE CHILD'S] AUTISM IS "NOT SEVERE IN NATURE" AND HE "IS NOT EXHIBITING ANY BEHAVIORAL ISSUES."

[POINT IV]

THE DIVISION FAILED TO PROVE PRONG THREE WAS MET WHERE IT FAILED TO PROVIDE SERVICES THAT WERE REASONABLE UNDER ALL THE CIRCUMSTANCES AND THE COURT DID NOT EXPLORE ALTERNATIVES TO TERMINATION.

A. DCPP'S CARELESS APPROACH, RATHER THAN TAILORED SERVICES, WAS NOT REASONABLE.

B. THE COURT ERRED BY FINDING THAT DCPP CONSIDERED ALTERNATIVES TO TERMINATION WHERE IT REFUSED TO PLACE [THE CHILD] WITH HIS GRANDMOTHER.

[POINT V]

THE TRIAL COURT ERRED IN FINDING THAT DCPP DEMONSTRATED BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION OF [DEFENDANT'S] PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD WHERE [THE CHILD] HAS BEEN PLACED AND REMOVED FROM SIX FOSTER CARE HOMES BY DCPP PROVING THAT FOSTER CARE HAS NOT LED TO A SCINTILLA OF PERMANENCY.

I.

The legal framework regarding the termination of parental rights is well-established. Parents have a constitutional right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); see also In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999) (citation omitted) (recognizing that "[a] parent's right to enjoy a relationship with his or her child is constitutionally protected"). That right "is among the most fundamental of all rights." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 102 (2008)). A parent's constitutional right to raise his or her child is not absolute, however. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014). At times, a parent's interest must yield to the State's obligation to protect a child from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009). "In

6

some instances this may require a partial or complete severance of the parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986) (citation omitted).

To effectuate these concerns and balance the competing interests, the Legislature formulated a multi-part test to determine when it is in the child's best interests to terminate parental rights. Specifically, N.J.S.A. 30:4C-15.1(a) (2015) requires the Division to prove four prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;[2]
>
> (3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and

---

[2] The last sentence of this paragraph was deleted by L. 2021, c. 154, § 9. At oral argument, counsel for defendant, the Division, and the law guardian agreed that the recent revision to the statutory best-interests test has no impact on this case.

the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604–11. The four prongs of the test are "not discrete and separate" but rather "relate to and overlap with one another to provide a comprehensive standard that identifies the child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that addresses the specific circumstances in the given case." Ibid. (quoting In re Adoption of Child. by L.A.S., 134 N.J. 127, 139 (1993)).

When applying the best-interests test, a trial court must pay particular attention to a child's need for permanency and stability. In re Guardianship of D.M.H., 161 N.J. 365, 385–86 (1999). The trial court must consider "not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).

The scope of our review is limited. Factual findings by a Family Part judge are "binding on appeal when supported by adequate, substantial, and

credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)); see also N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 216, 279 (2007). The deference we afford reflects the family court's specialized knowledge and experience. F.M., 211 N.J. at 427. Accordingly, we may reverse a factual finding only if there is "'a denial of justice' because the family court's 'conclusions are [ ] "clearly mistaken" or "wide of the mark."'" Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (alteration in original) (quoting E.P., 196 N.J. at 104). An appellate court should not disturb the trial court's findings unless it is "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant, and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms, 65 N.J. at 484).

The deference we accord to findings made by a Family Part judge applies in parental termination cases. See In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). "When a biological parent resists termination of his or her parental rights, the [judge's] function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." R.L., 388 N.J. Super. at 87. The factual findings that support such a judgment "should not be disturbed

unless 'they are so wholly unsupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms, 65 N.J. at 483–84); see also E.P., 196 N.J. at 104.

## II.

Defendant contends the trial court abused its discretion with respect to all four prongs of the best-interests test. We disagree. We conclude the Division proved all four prongs by clear and convincing evidence. As noted above, we affirm substantially for the reasons articulated by Judge Gaus in his commendably detailed and thorough written opinion. We add the following comments.

The Division's decision to shift the permanency goal from reunification to adoption was made only after years of concerted efforts by the Division to provide services to keep the family intact. Despite defendant's contrary claim, the record amply supports the trial court's determination that the Division provided extensive individualized, carefully tailored services to both the defendant and the grandmother. There have been numerous psychological

evaluations, bonding evaluations, supervised visitations, and individualized psychotherapy.

We note further that the Division presented extensive evidence at the guardianship trial, including testimony from multiple expert witnesses whom the trial judge found to be credible. The Division's experts opined that despite the Division's efforts, defendant will not be able to provide a safe and stable home for the child. The law guardian's expert reached the same conclusion, and even defendant's expert questioned her ability to safely parent the child.

We recognize that defendant's shortcomings as a parent can be attributed in large part to her cognitive limitations—a circumstance beyond her control. As we have already noted, defendant struggles to understand why the child was removed and why the Division sought to terminate her parental rights. In view of her severe cognitive limitations, we believe she is morally blameless for the manner in which she exercised her parental responsibilities. We must focus, however, on the best interests of the child. Those interests require termination of parental rights notwithstanding that defendant is not blameworthy by reason of circumstances beyond her control. In A.W., our Supreme Court commented, "[w]e cannot determine how much the inability of the parents to transfer affection or care to their children may be attributed to the parents' being short-

changed by either nature or society." 103 N.J. at 614–15. The Court added, "[p]arents are not to be adjudged unfit because they lack resources or intelligence, but only by reason of conduct detrimental to the physical or mental health of the child, specifically in the form of actual or imminent harm." Id. at 616. Applying the credible evidence adduced at the guardianship trial to that foundational principle, we agree with the trial judge that despite the sustained efforts by the Division to provide services and assistance, defendant is and will continue to be unable to address the child's special needs.

Finally, we address defendant's contention that the Division's efforts "[have] not led to a scintilla of permanency" and that termination of defendant's parental rights will do more harm than good. As noted, we pay particular attention to a child's need for permanency and stability. D.M.H., 161 N.J. at 385–89. Regrettably, the child in the course of his young life has been placed in six resource homes and everyone agrees that adoption will be challenging. The evidence presented by the Division pertaining to the fourth prong, while meeting the clear and convincing standard of proof, presents a closer question than with respect to the other three prongs of bests-interests test.

As we have explained, the fourth prong requires the Division to demonstrate that "[t]ermination of parental rights will not do more harm than

good."  N.J.S.A. 30:4C-15.1(a)(4).  The fourth prong "'serves as a fail-safe against termination even where the remaining standards have been met.'"  E.P., 196 N.J. at 108 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007)).  In determining whether the fourth prong has been established, the trial court may rely on expert testimony and when conducting its analysis, it may balance the potential injury that a child could experience through the termination of parental rights against the harm that the child might suffer if removed from the resource placement.  See K.H.O., 161 N.J. at 355 ("Weighing the potential harm that terminating [the child's] relationship with her mother against that which might come from removing her from her foster home is painfully difficult, but it is a decision that necessarily requires expert inquiry specifically directed to the strength of each relationship.") (quoting J.C., 129 N.J. at 25).

The case before us does not present a situation where termination of parental rights is a prerequisite for an impending adoption.  Cf. N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 592–95 (App. Div. 1996) (recognizing that termination of parental rights is necessary when it permits a child to have a secure and permanent home).  In E.P., our Supreme Court recognized that "terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child."  196 N.J. at 109 (quoting A.W.,

103 N.J. at 610–11). "Such harm," the Court explained, "may occur when a child is cycled through multiple foster homes after a parent's rights are severed." Ibid. The Court also noted, "[i]t has been 'suggested that [a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for . . . a more promising relationship . . . [in] the child's future.'" Id. at 108 (alteration in original) (quoting A.W., 103 N.J. at 610).

There is, however, no categorical rule that precludes termination of parental rights unless and until the Division has lined up a permanent placement for the child. As the Court in E.P. acknowledged, "[w]e know that '[t]ermination of parental rights does not always result in permanent placement of the child' and 'that too many children "freed up" for adoption do not in the end find permanent homes.'" Id. at 109 (quoting J.C., 129 N.J. at 21).

In E.P., the Court reversed the order terminating parental rights, concluding the Division failed to satisfy the fourth prong by clear and convincing evidence. Id. at 110. Defendant's reliance on this decision is misplaced since the circumstances that necessitated the result in E.P. are readily distinguishable from the case now before us. In E.P., parental rights were terminated "based in large part on [E.P.'s] addiction to drugs, psychological

14

problems, and unstable lifestyle, all of which made her unfit to care for her child for most of the child's life." Id. at 92. Despite those challenges, which included a period of incarceration, E.P. managed to maintain a relationship with her daughter and visited her as frequently as the court permitted. Id. at 93–94. Throughout a period of nine years, E.P. attended multiple in-patient and out-patient rehabilitation programs to address her heroin addiction, and despite occasional relapses, she eventually found a job and an apartment. Id. at 94. She also completed a parenting skills program and for the most part complied with the Division's reunification plan, which involved submitting to psychological evaluations, random drug testing, psychotherapy, and medication-assisted (methadone) drug rehabilitation. Ibid. The Division ultimately filed a guardianship complaint seeking the termination of her parental rights because of her "intractable drug problem." Ibid.

The daughter, who was almost thirteen years old, was emotionally fragile and unstable, and had been placed in twelve different foster homes. Id. at 92, 95. During this time, E.P. still visited her daughter, who was developing a positive relationship with E.P.'s boyfriend. Id. at 95. The daughter exhibited behavioral problems as she moved between resource placements, ranging from tantrums and explosive outbursts to assaulting other children and physically

threating various foster parents. Ibid. Significantly, she also threatened or attempted to kill herself on multiple occasions, which culminated with her transfer to an "emergency" foster placement and treatment home. Ibid. The daughter asked to be reunited with her mother repeatedly, and even told a teacher that if she could not be with E.P., she wanted to die. Id. at 95–96.

During the guardianship hearing, the family court judge encouraged the Division to reconsider kinship guardianship because of E.P.'s age and her attachment to her mother. The judge noted that the daughter "had no desire to be adopted and therefore an attempt at adoption would likely be 'futile.'" Id. at 97. The daughter's law guardian, moreover, opposed termination and believed that the judge focused too much on E.P.'s parental shortcomings rather than on the significant harm termination would cause the daughter. Id. at 98–99, 106.

The judge nonetheless terminated E.P.'s parental rights. In reversing that decision, the Supreme Court noted that the trial court terminated E.P.'s parental rights, "with a marked reluctance, understanding that its conclusion that termination would not do more harm than good was a prediction, at best." Id. at 110. On those facts, the Supreme Court held that the record did not support the conclusion that the Division satisfied the fourth prong by clear and convincing evidence. Ibid.

In the case before us, the child has been in six resources homes and the experts all agree that his permanent placement will be difficult. However, in stark contrast with the situation in E.P., the child never developed a strong bond with defendant or the grandmother. We recognize, as did Judge Gaus, that the child's special needs and emotional and cognitive limitations make it difficult to ascertain the depth and strength of his bond with his mother and grandmother. Even so, as Judge Gaus found, defendant's own expert "was unable to say…that the child is currently securely bonded to [defendant] or the grandmother."

Furthermore, it reasonably appears the child is presently in a stable resource placement. The Division explained at oral argument that the current resource family, while not prepared to adopt the child, has expressed its commitment to serve as a resource placement until the child is adopted. In these circumstances, there is no reason to believe the child will be "cycled through multiple foster homes after [the mother's] rights are severed." See A.W., 103 N.J. at 611. We therefore conclude the trial judge did not abuse his discretion in determining that the Division satisfied the fourth prong by clear and convincing evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3820-19